THE STATE OF OHIO, APPELLEE, *v*. NOLING, APPELLANT.

[Cite as *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044.]

*Criminal law — Aggravated murder — Death penalty upheld, when.*

(No. 1999-1524 — Submitted September 17, 2002 — Decided December 20, 2002.)

APPEAL from the Court of Appeals for Portage County, No. 96-P-126.

_____

COOK, J.

{¶1}   Defendant-appellant, Tyrone Lee Noling, appeals from an 11th Appellate District judgment upholding his convictions of two counts of aggravated murder, two counts of aggravated robbery, and one count of aggravated burglary.  For the following reasons, we affirm Noling's convictions and death sentence.

I. Facts

{¶2}   On April 5, 1990, in the course of a burglary and robbery, defendant-appellant, Tyrone Noling, shot and killed Bearnhardt and Cora Hartig in Portage County, Ohio.  After a 1992 dismissal of charges against Noling, a grand jury reindicted him in August 1995 for the Hartig murders.  The state proved the offenses charged through the testimony of police officers and others, including accomplices Butch Wolcott and Joseph Dalesandro.

{¶3}   The testimony adduced at trial revealed that in early April 1990, Noling, Gary St. Clair, Dalesandro, and Wolcott stayed at the house of a teenage friend, Johnny Trandifer, in Alliance, Ohio.  To obtain money, the group "went car shopping   * * * opened up car doors that were unlocked and stole the change * * * radios, phones, whatever."

**{¶4}** Noling then suggested "the idea that old people were getting their * * * Social Security checks early in the month and * * * would be the best target to rob." Noling planned to gain entry into the homes by knocking on the door and pretending to need to use their telephone to call about his disabled car. At that point, the group was armed with a shotgun and a BB gun.

**{¶5}** Noling and St. Clair implemented just such a plan in robbing a Mr. and Mrs. Hughes in their Alliance home, approximately a quarter of a mile from Trandifer's house. Noling told Wolcott that he had knocked on the door, asked to use the phone because his car was broken down, and when he and St. Clair got in, they held the Hugheses up. According to St. Clair, Noling got inside, "kicked the door shut, pulled the sawed off shotgun out," and told Mr. Hughes, "Don't move." They used a pillowcase to carry away a VCR, jewelry, and a .25 caliber pistol.

**{¶6}** Around noon the next day, Noling used this stolen .25 caliber pistol to rob the Murphy family in Alliance. Noling acted alone and said that he had had to fire the weapon while inside the house. Noling stole a VCR, rings, and money from the Murphy residence.

**{¶7}** Around 3:30 to 4:00 p.m. that same day, Dalesandro drove Noling, St. Clair, and Wolcott from Alliance into Portage County. They stopped at the Hartigs' ranch home in Atwater Township. The Hartigs were both 81 years old. When Dalesandro stopped and Noling and St. Clair got out, Bearnhardt Hartig was mowing the grass.

**{¶8}** Noling knocked on the front door, and when Cora Hartig answered, Noling "pushed his way in" and St. Clair followed him. St. Clair had the shotgun, and Noling had a .25 caliber semiautomatic, with one clip in the gun and another clip in his pocket.

**{¶9}** After dropping Noling and St. Clair off, Dalesandro and Wolcott drove around for a while, returned, and parked in the Hartigs' driveway. About 20 to 30 minutes after Noling and St. Clair had entered the Hartigs' home,

Wolcott "heard some gunshots, * * * heard a lady scream and then * * * a couple of more gunshots * * * and then a few seconds later [Noling and St. Clair] came running out" and got in the car.

{¶10} Noling looked "flabbergasted," and things were hysterical. He told Dalesandro, who was driving, to "[g]et out of here * * * I just killed two old people." Noling said that "he had to do it, just didn't have a choice" because "the old man wouldn't stop, that he kept coming at him." Noling also claimed that the lady "could tell the police who they were." Noling put the .25 caliber pistol in the glove compartment, and Dalesandro drove back to Alliance.

{¶11} Once back, Noling was concerned about getting rid of his blood-stained clothes. Noling also told Dalesandro that if Dalesandro said anything about what had occurred, Noling would kill him. That night, Noling also put a gun to Wolcott's head and said that "if [Wolcott] talked he would blow [his] head off."

{¶12} On April 7, 1990, James Davis, the son of neighbors of the Hartigs, noticed that the Hartigs' garage door was open and that the lawn tractor had been sitting in the yard for two days. He checked on the Hartigs and found them lying on their kitchen floor. Davis called the police.

{¶13} The police found the bodies fully clothed in the kitchen and noticed a strong smell, apparently from decaying flesh. Detectives found ten Winchester .25 caliber shell casings near the bodies, and recovered eight .25 caliber bullets from the crime scene and autopsies. Nancy Bulger, a firearms expert, concluded that a single .25 caliber semiautomatic pistol had ejected all of the shells found and that a single weapon had fired all eight bullets recovered. Bulger testified that the ammunition clip for most .25 caliber semiautomatics carries six or seven rounds, but extended magazines for .25 caliber firearms, although not common, do exist.

{¶14} In the Hartigs' master bedroom, detectives found open dresser drawers as well as seven empty ring boxes. In the living room, police found a metal box with a lock and key.

{¶15} Dr. Elizabeth Balraj, the Cuyahoga County Coroner, supervised and observed the autopsies. She testified that Cora Hartig had been shot five times and had died "as a result of * * * gunshot wounds to her chest with internal injuries." Bearnhardt Hartig, shot three times, died from "gunshot wounds to [his] right chest with multiple visceral injuries." Dr. Balraj found no evidence of stippling or gunpowder residue; therefore, Dr. Balraj concluded, the shots had been fired from a distance greater than one and one half to three feet.

{¶16} On the day that police discovered the Hartigs' bodies, Noling and his cohorts had a party at Trandifer's house. At the party, Noling was acting drunk and bragging about the Alliance robberies, but not about the Atwater Township murders. After a police cruiser drove by, Noling grabbed Wolcott, started screaming, and said that "he was going to kill him, he better not have told." Noling also asked Robyn Elliot if she "had heard anything on the police scanner about two old people getting shot in Atwater." When she said no, Noling was "just laughing and acting like a big shot." In fact, the first television news reports about the Hartig murders did not air until the evening of the next day.

{¶17} Two days after the discovery of the Hartigs' bodies, Alliance police arrested Noling and his accomplices in connection with the Alliance robberies. While in police custody with Noling, St. Clair asked Alliance police officers the identity of two out-of-town detectives who wanted to interview them. After being told their names, St. Clair asked, "Is it about the two old people who were killed in Atwater?" Noling immediately told St. Clair, "Keep your mouth shut about that, don't say another word, keep quiet."

{¶18} Noling admitted his involvement in the Hartig murders to two fellow jail inmates. He told inmate Paul Garner that he "didn't mean to do it.

Just happened. The lady said: I know who you are." St. Clair had "said his name, and so they had to kill both of them." Noling also described the murders to jail inmate Ronnie Gantz. Noling told Gantz that St. Clair was the shooter, but then subsequently recanted, claiming instead that he was the shooter because St. Clair "was too weak to shoot anyone." Noling told Gantz that he shot Bearnhardt with a .25 caliber automatic because "the man tried to be a hero." St. Clair denied any involvement in the murders to Gantz.

{¶19} Noling told Corrections Officer Lawrence Kouri that St. Clair was "trying to frame" Noling for the Hartigs' murder. On May 4, 1990, Noling also told Portage County Sheriff Duane Kaley that Wolcott and St. Clair had committed the murders, but Noling "knew where the firearm involved" was and knew about a bloody shirt and stolen stereo. Noling talked about two semiautomatic .25 caliber weapons. Based on the information from Noling and from a man named Chico, police recovered the .25 caliber semiautomatic pistol that Noling had fired during the Murphy robbery. Police never recovered the weapon used to kill the Hartigs.

{¶20} Noling later told Anthony Travise, a fellow inmate, how St. Clair, Dalesandro, Wolcott, and Noling had robbed several people. Noling admitted that he was a suspect in the Hartig murders, but never admitted to Travise that he was responsible for their deaths. Noling also told Travise that if he ever testified against Noling, "he would get [him] one way or another."

{¶21} At trial, St. Clair described a somewhat different version of events. St. Clair testified that the group had stolen items from unlocked cars and that Noling had suggested robbing elderly people in their homes by asking to use a telephone. St. Clair also described how he and Noling had robbed the Hughes family and what he knew about Noling's robbery of the Murphy family.

{¶22} St. Clair admitted that he had pled guilty to aggravated robbery and aggravated murder in connection with the Hartig murders, and that he had

received a sentence of 20 years to life. St. Clair denied, however, that Noling or he had been in Atwater Township on April 5, 1990, and steadfastly claimed that they had no part in the Hartig murders.

{¶23} The grand jury indicted Noling on two counts of aggravated felony murder; Count One charged the murder of Bearnhardt Hartig, and Count Two charged the murder of Cora Hartig. Death specifications in each count charged murder in the course of "Aggravated Robbery and/or Aggravated Burglary (spec. 1)," R.C. 2929.04(A)(7), and murder to escape "detection or apprehension or trial or punishment" for another offense (spec. 2), R.C. 2929.04(A)(3). Counts Three and Four both charged aggravated robbery, and Count Five charged aggravated burglary. All five counts included gun specifications. The trial jury found Noling guilty as charged. Noling was separately convicted and sentenced for the Murphy and Hughes robberies.

{¶24} Following a penalty hearing, the jury recommended that Noling be sentenced to death on Counts One and Two. The trial court sentenced Noling to death on both counts and to consecutive prison terms for Counts Three, Four, and Five and for the firearms specifications. The 11th District Court of Appeals affirmed the convictions and death sentence.

{¶25} The cause is now before this court upon an appeal as of right.

II. Summarily Rejected Propositions of Law

{¶26} Noling presents 21 propositions of law for our consideration. This court is not required under R.C. 2929.05, however, to address and discuss in opinion form each proposition of law an appellant raises in a capital case. *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 149, 749 N.E.2d 226; *State v. Treesh* (2001), 90 Ohio St.3d 460, 463, 739 N.E.2d 749. Accordingly, we summarily overrule Noling's twentieth proposition of law, which challenges the court's reasonable-doubt instruction and the statutory definition from R.C. 2901.05 because his complaint lacks merit. See *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739

6

N.E.2d 300; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604; *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph two of the syllabus. Further, the use of the term "firmly convinced of the truth of the charge" in the penalty phase was harmless. *State v. Mitts* (1998), 81 Ohio St.3d 223, 233, 690 N.E.2d 522; *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82.

{¶27} We also summarily reject Noling's twenty-first proposition of law challenging the constitutionality of Ohio's death penalty statute. See *State v. Carter* (2000), 89 Ohio St.3d 593, 606-608, 734 N.E.2d 345; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. Noling failed to raise his international law challenge at the trial court or before the court of appeals and thereby waived the claim. *State v. Coley* (2001), 93 Ohio St.3d 253, 271, 754 N.E.2d 1129; *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus. That international law challenge also lacks merit. *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103-104, 656 N.E.2d 643.

III. Evidentiary Issues

A. Limits on Cross-examination

{¶28} In his first proposition of law, Noling argues that the trial court improperly precluded him "from cross-examining a witness about a strong motive to fabricate testimony" and thereby deprived Noling "of his confrontation and due process rights." Noling has forfeited this issue, however, by not raising it before the court of appeals. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

{¶29} We also find no merit in Noling's arguments. Noling claims that the trial court unfairly limited his cross-examination of Joseph Dalesandro about statements by an assistant prosecutor in July 1992. At Dalesandro's sentencing

hearing in July 1992, an assistant prosecutor repudiated Dalesandro's plea bargain agreement due to his lack of cooperation and truthfulness. At trial, Noling wanted to cross-examine Dalesandro to elicit that assistant prosecutor's 1992 opinion about Dalesandro's cooperation and truthfulness in the investigation. The trial court refused to allow the proposed cross-examination because the prosecutor's "opinion whether [Dalesandro] is telling the truth * * * is [an issue] for the jury to determine."

{¶30} In our view, the trial court correctly excluded evidence about the assistant prosecutor's 1992 opinion as to Dalesandro's credibility. As this court has commented before, "the trier of fact * * * is burdened with assessing the credibility and veracity of witnesses." *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894. See, also, *State v. Boston* (1989), 46 Ohio St.3d 108, 128-129, 545 N.E.2d 1220 ("an expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant"). Further, the prosecutor's subjective beliefs were irrelevant, and his out-of-court statements about Dalesandro's veracity would have constituted hearsay. See Evid.R. 802.

{¶31} Moreover, Noling extensively cross-examined Dalesandro about his motives and the underlying plea agreement. The slight limitation on cross-examination to exclude the prosecutor's opinion on Dalesandro's credibility therefore could not have constituted an abuse of discretion or prejudiced Noling. See *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 682, 106 S.Ct. 1431, 89 L.Ed.2d 674 (violation of confrontation rights is subject to harmless-error analysis). Accordingly, we overrule Noling's first proposition of law.

### B. State Treatment of Hostile Witness

{¶32} In his second proposition of law, Noling argues that the trial court erred both in declaring St. Clair a hostile witness and in not restricting the state's cross-examination and impeachment of its own witness. We reject Noling's contentions that these acts constitute reversible error.

8

{¶33} At trial, St. Clair testified as a prosecution witness about Noling's involvement in the Hughes and Murphy robberies. St. Clair also confirmed that he had pled guilty to aggravated murder and aggravated robbery and received a sentence of 20 years to life in connection with the Hartig murders. St. Clair denied, however, that either he or Noling went to Portage County on April 5 or that they were involved in the Hartig murders.

{¶34} After St. Clair's denial, the state asked the court "to declare the witness a hostile witness." The court responded, "I suspect you laid the groundwork for that." The state then asked St. Clair additional leading questions about his guilty plea and sentence relating to the Hartig murders.

{¶35} Over continuing defense objection, the state questioned St. Clair about details in his pretrial confession admitting that he and Noling had robbed the Hartigs and that Noling had shot them. St. Clair admitted making the statement, but continued to deny involvement in the Hartig murders. As Noling points out, the state asked no "less than sixty-seven (67) questions regarding St. Clair's prior statement, literally reading questions and answers [from the statement]." Thus, the state placed the substance of St. Clair's confession that implicated Noling before the jury.

{¶36} The state then began to question St. Clair by quoting from a narrative of another police interview of St. Clair. The court asked the prosecutor, "Are you suggesting that the jury should accept as true the statements that you are now cross examining on, is that what you're trying to do?" The prosecutor responded, "yes." Then the court declared it would "sustain an objection from now on. You have impeached your witness and you established he * * * didn't tell the truth."

{¶37} Evid.R. 607(A) allows a party calling a witness to attack the witness's credibility "by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." Noling concedes that the state

proved the latter requirement of affirmative damage. But he argues that because the state failed to demonstrate the former requirement—that it was surprised by St. Clair's denial of Noling's guilt—the use of the prior inconsistent statements was improper. Noling further argues that the trial court failed to control the state's cross-examination of St. Clair when the state repeatedly quoted St. Clair's pretrial confession that implicated Noling. In response, the state contends that Noling waived, or forfeited, this complaint by not raising it at the court of appeals. Because Noling did complain at the court of appeals about the court's declaration of St. Clair as a hostile witness, we conclude that he properly preserved the issue.

{¶38} We hold that the prosecutor's improper cross-examination of St. Clair does not require reversal of the jury's verdict of guilt. We reach this result for several reasons.

{¶39} First, the trial court specifically instructed the jury that "[i]f statements in a transcript or written or typed statements differed from the testimony given by the same witness in the courtroom, you may consider them to test the credibility or believability of such witness, and *for no other purpose*." (Emphasis added.) Noling neither objected to this instruction nor asked for additional instructions, and we presume that jurors follow the court's instructions. See, e.g., *State v. Williams* (1995), 73 Ohio St.3d 153, 159, 652 N.E.2d 721. Thus, we presume that the jury considered the substance of the inconsistent statement *only* as it reflected upon St. Clair's credibility.

{¶40} Second, we cannot say that the prosecutor's improper tactics actually prejudiced Noling in light of the other abundant evidence establishing Noling's guilt. Noling admitted to Wolcott, Dalesandro, and others that he had personally shot and killed the Hartigs. Wolcott and Dalesandro also directly placed Noling inside the Hartigs' home with a .25 caliber semiautomatic pistol, the type of weapon used to kill the Hartigs. Moreover, St. Clair's total disclaimer

10

of guilt, on behalf of Noling and himself, lacked any credibility because St. Clair had pled guilty to the murder of the Hartigs.

**{¶41}** We therefore find no error warranting reversal in relation to Noling's second proposition of law.

### C. "Other Acts" Evidence

**{¶42}** In his third proposition of law, Noling argues that the trial court erred in admitting, over objection, "other acts" criminal-propensity evidence that prejudiced him. Noling challenges the admission of evidence that he robbed the Hughes and Murphy families, stole from unlocked cars, and thought about robbing a Dairy Mart. His arguments regarding this evidence are without merit.

**{¶43}** The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice. *State v. Issa* (2001), 93 Ohio St.3d 49, 64, 752 N.E.2d 904. We must therefore confine our inquiry to determining whether the trial court acted unreasonably, arbitrarily, or unconscionably in deciding the evidentiary issues about which Noling complains. See *State v. Barnes* (2002), 94 Ohio St.3d 21, 23, 759 N.E.2d 1240.

**{¶44}** Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. "It may, however, be admissible * * * [to show] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This court has declared that "the standard for determining admissibility of such evidence is strict." *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

**{¶45}** We have also recognized, however, that "[o]ther acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B)." *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, syllabus. In order "[t]o be admissible to prove identity through a certain

11

*modus operandi*, other-acts evidence must be related to and share common features with the crime in question." *State v. Lowe* (1994), 69 Ohio St.3d 527, 634 N.E.2d 616, paragraph one of the syllabus.

{¶46} There were some differences in the offenses against the Hughes and Murphy families as contrasted with the offenses against the Hartigs. But this court has held that "[a]dmissibility is not adversely affected simply because the other [crimes] differed in some details." *Jamison*, 49 Ohio St.3d at 187, 552 N.E.2d 180. Accord *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 366, 662 N.E.2d 311.

{¶47} In this case, Noling's robbery of the Hughes and Murphy families helped to establish Noling's identity as a participant in the aggravated robbery and aggravated murder of the Hartigs. That evidence also showed Noling's "intent, preparation, [and] plan" in accordance with Evid.R. 404(B). Noling had devised a scheme of securing entry and robbing elderly persons in their homes by asking to use their telephone on the pretense that his car had broken down. In each instance, Noling was armed with a firearm. Each robbery occurred near the beginning of the month when Noling thought that the families would have cashed their Social Security checks. And in each instance, Noling targeted elderly persons in their homes because he thought that they would be more vulnerable.

{¶48} Moreover, we note that the trial court instructed the jury that the evidence was "received for a very limited purpose. * * * [Y]ou may not consider it to prove the character of the defendant in order to show the act in conformity or in accordance with the character." The court then instructed the jury as to the limited purposes for which the jury could consider such evidence. In fact, the court repeated an "other acts" instruction at key points *throughout* the trial. In light of the instructions given and the probative value of the evidence of the Murphy and Hughes robberies, we find that the trial court did not abuse its discretion in allowing this "other acts" evidence.

{¶49} The court may have abused its discretion by admitting evidence that Noling stole from unlocked cars or contemplated robbing a Dairy Mart. Those offenses were not "similar acts" and did not show identity or a common scheme or plan. No prejudicial error exists, however, because the impact of that evidence was minimal given the other-acts instruction and the abundant, compelling evidence of Noling's guilt.

{¶50} Finally, Noling complains that "other acts" evidence also affected the penalty phase. As discussed, the trial court properly admitted the evidence of the Murphy and Hughes robberies at trial. Moreover, this court has recognized that a defendant's prior crimes are directly relevant to his "history, character, and background," R.C. 2929.04(B), which a sentencing jury must consider. *State v. Waddy* (1992), 63 Ohio St.3d 424, 428-429, 588 N.E.2d 819. Accord *State v. Cooey* (1989), 46 Ohio St.3d 20, 35, 544 N.E.2d 895. We thus overrule Noling's third proposition of law.

D. Manifest Weight of the Evidence

{¶51} Noling argues in his fourth proposition of law that his conviction "is against the manifest weight of the evidence." However, Noling failed to argue that issue before the court of appeals, which was the appropriate forum. When this court reviews a criminal case, including a capital case on appeal from the court of appeals, this court weighs "evidence only to determine whether it is of sufficient probative force to support a finding of guilt." *State v. Tyler* (1990), 50 Ohio St.3d 24, 33, 553 N.E.2d 576, citing *State v. Nicely* (1988), 39 Ohio St.3d 147, 155, 529 N.E.2d 1236.

{¶52} In this case, we find that substantial evidence supports Noling's conviction for the aggravated burglary, robbery, and murder of the Hartigs. Wolcott and Dalesandro saw Noling, who alone was armed with a .25 caliber semiautomatic, forcibly enter the Hartig home with St. Clair, and knew that they planned to rob the Hartigs. Wolcott heard shots, and both Wolcott and

Dalesandro saw Noling and St. Clair then run from the Hartig home. Noling told both Wolcott and Dalesandro that he had shot the Hartigs and warned them not to tell the police. Noling also told St. Clair in front of the police to keep his mouth shut about the Atwater Township murders. Additionally, Noling admitted to fellow inmates Garner and Gantz that he shot the Hartigs and admitted to inmate Travise that he had robbed the Hartigs. Noling additionally admitted to police that he knew about the crime, although he tried to blame St. Clair. Finally, other evidence established that Noling had devised the plan to rob elderly individuals in their homes and that he had robbed two other couples within a day of shooting the Hartigs.

{¶53} To support his arguments challenging the evidence, Noling points to alleged credibility issues concerning Garner, Gantz, Wolcott, and Dalesandro, the lack of forensic evidence, the fact that the police never recovered the murder weapon, and St. Clair's avowal of innocence. Essentially, Noling is rearguing the evidence that he believes supported his defense. But the jury considered and rejected each of these arguments when it found him guilty.

{¶54} The jury has the primary responsibility to weigh the evidence and assess the credibility of the witnesses. See *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. We therefore reject this proposition of law as lacking merit.

E. Victim-impact Evidence

{¶55} In his sixth proposition of law, Noling argues that the trial court wrongfully admitted victim-impact evidence during the trial phase. Noling refers specifically to the testimony of James Davis, who discovered the Hartigs' bodies. Davis testified over defense objection that the Hartigs liked to play cards, talk to people, and work around the yard. Noling also challenges the testimony of Bonnie Treesh (also spelled Treash in record), the Hartigs' niece who spent summers with the Hartigs and identified their photograph.

14

**{¶56}** No reversible error exists. We note that the trial court sustained objections to details about the personal lives of the Hartigs. The testimony targeted by overruled objections was admissible. Davis explained why he went to check on the Hartigs. Because the Hartigs were gregarious and meticulous, the fact that their lawn mower had been left out and that their garage door had been left open were notable to Davis. Cf. *State v. Allen* (1995), 73 Ohio St.3d 626, 633, 653 N.E.2d 675. Moreover, Davis's testimony helped to prove the time of death. And Treesh's testimony simply established that the Hartigs had been living persons, an element of the aggravated murder charge.

**{¶57}** The foregoing testimony was thus related to the crimes and was not simply inflammatory as Noling claims. As this court noted regarding similar evidence in *State v. Lorraine* (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212, "this evidence illustrated the nature and circumstances of the crimes. * * * The victims cannot be separated from the crime." See, also, *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878; *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071. Consequently, we overrule the sixth proposition of law.

IV. Indictment and Form of Charges

A. Missing Element in Indictment

**{¶58}** Noling argues in his seventh proposition of law that the felony-murder death specifications in the indictments were fatally deficient in not alleging that Noling "was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design," as R.C. 2929.04(A)(7) requires. An accused must be the principal offender or act with prior calculation and design to be guilty of an (A)(7) death specification. See *State v. Taylor* (1993), 66 Ohio St.3d 295, 612 N.E.2d 316, syllabus.

**{¶59}** As Noling notes, the indictment refers to R.C. 2929.04(A)(7) but simply alleges in Counts One and Two that Noling committed the respective murders while "committing Aggravated Robbery and/or Aggravated Burglary. Such act being a Specification of Felony Murder." At the close of the state's case, Noling noted the deficiency and moved under Crim.R. 29 to dismiss the (A)(7) specifications. The state never moved to amend the indictment, and the trial court rejected the motion to dismiss. The trial court, however, instructed the jury that it must determine whether Noling was the principal offender, and the jury verdicts specifically found that Noling was the principal offender in each murder.

**{¶60}** We recognize that every defendant has a due process right to notice of the specific charge. *Cole v. Arkansas* (1948), 333 U.S. 196, 201, 68 S.Ct. 514, 92 L.Ed. 644. Here, the state never amended the indictment to more properly allege a death-penalty specification under R.C. 2929.04(A)(7). Compare *Dunn v. United States* (1979), 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743; *Stirone v. United States* (1960), 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252; *State v. Dilley* (1989), 47 Ohio St.3d 20, 546 N.E.2d 937.

**{¶61}** Noling, however, never complained about the language missing from the specifications until the state rested. Under Crim.R. 12(B), now (C), "[d]efenses and objections based on defects" in the indictment must be raised before trial. As then specified in Crim.R. 12(G), now (H), "[f]ailure by the defendant to raise defenses or objections" within the time required "shall constitute waiver thereof," although the court may grant relief from such waiver. Accord *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364; *State v. Brooks* (1996), 75 Ohio St.3d 148, 158, 661 N.E.2d 1030; *State v. Mills* (1992), 62 Ohio St.3d 357, 362, 582 N.E.2d 972.

**{¶62}** We therefore consider whether plain error exists. "Under Crim.R. 52(B), '[p]lain errors or defects affecting substantial rights may be noticed

although they were not brought to the attention of the court.'  We have previously explained that this rule 'places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial': (1) 'there must be an error, *i.e.,* a deviation from a legal rule,' (2) 'the error must be plain,' which means that it 'must be an "obvious" defect in the trial proceedings,' and (3) 'the error must have affected "substantial rights," ' which means that 'the trial court's error must have affected the outcome of the trial.' *Barnes,* 94 Ohio St.3d at 27, 759 N.E.2d 1240. Further, the decision to correct a plain error is discretionary and should be made ' "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." '  Id., quoting *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus." *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 45 (plurality opinion).

**{¶63}**  We find no plain error because one could not reasonably conclude that but for the missing language the trial result would have been otherwise.  And because Noling does not argue that the form of the indictment constitutes "a special category of forfeited erro[r] that can be corrected regardless of [its] effect on the outcome" of his trial, we need not and do not address that issue.  See id. at fn. 2.  The form of the indictment has caused no "miscarriage of justice."  The indictment charged only Noling, and the state's evidence proved that Noling was the actual shooter, hence the principal offender.  Moreover, the indictment afforded Noling adequate notice of the death penalty because both specifications specifically mentioned R.C. 2929.04(A)(7).  See *State v. Joseph* (1995), 73 Ohio St.3d 450, 456, 653 N.E.2d 285 (specification is sufficient if defendant knows which subsection has been alleged).  Similarly, in *State v. Biros* (1997), 78 Ohio St.3d 426, 436, 678 N.E.2d 891, this court also found the defect waived when the accused failed to complain that the indictment did not include the "principal offender" language.  Accord *Carter*, 89 Ohio St.3d at 597, 734 N.E.2d 345

(missing element of offense in rape-murder not fatal in view of failure to object). Cf. *State v. Bonnell* (1991), 61 Ohio St.3d 179, 184, 573 N.E.2d 1082 (no plain error although no instructions or jury finding as to "principal offender" status).

{¶64} In the present case, unlike *Bonnell* and *Biros*, the trial court specifically instructed the jury that it must find whether Noling was the principal offender, and the jury specifically so found. Thus, this case differs from the issue the federal court recently decided in *Esparza v. Mitchell* (C.A.6, 2002), 310 F.3d 414. In *Esparza*, the trial judge never instructed the jury to determine whether the accused was the principal offender and the jury's verdict failed to find specifically that the defendant was the principal offender.

{¶65} We reject the seventh proposition of law.

B. Ambiguous Indictment

{¶66} In his eighth proposition of law, Noling argues that the indictment and the jury's verdict were deceptive, thereby violating his right to a unanimous jury verdict. In the indictment, both Counts One and Two, and specification 1 in both counts, referred to Noling committing the murders in the course of "Aggravated Robbery and/or Aggravated Burglary." Noling argues that this manner of charging "deprived him of his right to a unanimous jury verdict" because some jurors might have convicted him of these specifications on the basis of aggravated robbery and others on the basis of aggravated burglary.

{¶67} The form of the charge and the specifications, combining "aggravated robbery and/or aggravated burglary," was unnecessary and perilous. Using "and/or" can create ambiguity. See Garner, Dictionary of Modern Legal Usage (2d Ed.1995) 56. Noling, however, failed to raise this issue at trial or before the court of appeals and thus waived the issue save for plain error. See Crim.R. 12(B); 12(G) (now [H]). Accord *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraphs one and two of the syllabus; *Brooks*, 75 Ohio St.3d at 158, 661 N.E.2d 1030.

18

**{¶68}** We find no plain error. This court previously rejected a similar plain-error claim based on the use of a charge of "burglary and/or robbery" in a single aggravating circumstance. *State v. Keene* (1998), 81 Ohio St.3d 646, 664, 693 N.E.2d 246. The *Keene* court ruled that "the outcome would not clearly have been otherwise had the indictment been worded differently" because the jury there, as in this case, had separately convicted the defendant of aggravated burglary and aggravated robbery. Id. Accord *State v. Berry* (1995), 72 Ohio St.3d 354, 358, 369, 650 N.E.2d 433. Thus, jurors did not convict Noling of these charges or specifications on alternative theories because the same jury separately convicted Noling of *both* aggravated robbery and aggravated burglary. See, also, *State v. Spivey* (1998), 81 Ohio St.3d 405, 420, 692 N.E.2d 151, fn. 2. Noling has thus failed to satisfy at least the third prong of our plain-error inquiry—that *prejudicial* error exists. His eighth proposition of law is without merit.

## C. Guilt-phase Instructions

**{¶69}** Noling argues in his ninth proposition of law that the trial court's instructions on mens rea improperly reduced the state's burden of proof. But Noling failed to object at trial, submit alternative instructions, or raise these issues before the court of appeals. He thereby forfeited his complaints absent plain error. See Crim.R. 30(A) and 52(B); *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus; *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

**{¶70}** No plain error exists for two primary reasons. First, Noling complains about jury instructions incorporating the following language:

**{¶71}** "When the central idea of the offense is a prohibition against conduct of a certain nature, a person acts purposely when it is his specific intention to engage in conduct of that nature regardless of what he may have intended to accomplish by his conduct."

**{¶72}** The jurors could not reasonably have been confused by this disputed instructional language. The trial court's instructions emphasized that Noling must have specifically intended to cause the death of another to be guilty of murder. Moreover, Noling's decision to repeatedly shoot Bearnhardt and Cora Hartig left no question as to his intentions. Finally, this court has previously rejected similar arguments in other murder cases. See, e.g., *State v. Wilson* (1996), 74 Ohio St.3d 381, 392, 659 N.E.2d 292; *Carter* (1995), 72 Ohio St.3d 545, 552, 651 N.E.2d 965.

**{¶73}** Second, Noling argues that the causation instructions included inappropriate language for murder cases, as follows:

**{¶74}** "The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act or failure to act. The defendant is also responsible for the natural, foreseeable consequences or results that follow, in the ordinary course of events, from the act or failure to act."

**{¶75}** This court has held that such foreseeability language, while *inappropriate* in murder cases, does not create plain error. See, e.g., *State v. Getsy* (1998), 84 Ohio St.3d 180, 196, 702 N.E.2d 866; *Phillips*, 74 Ohio St.3d at 100, 656 N.E.2d 643; *State v. Frazier* (1995), 73 Ohio St.3d 323, 330, 652 N.E.2d 1000.

**{¶76}** We thus overrule the ninth proposition of law.

V. Penalty-phase Issues

A. Sentence Appropriateness

**{¶77}** In his fifth proposition of law, Noling first argues that the state failed to prove the charged aggravating circumstances. For the reasons previously discussed, however, the state proved Noling's identity as the killer of the Hartigs. The state also proved that Noling purposefully killed the Hartigs while committing or attempting to commit aggravated robbery and aggravated burglary, R.C. 2929.04(A)(7). Noling unlawfully entered the Hartig home by force or

20

deception, and his motive was robbery. Additionally, the state proved the (A)(3) specification (murder to escape detection or apprehension).

**{¶78}** Noling also asks that we give mitigating weight to residual doubt. This court has previously rejected residual doubt as a mitigating factor. *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus. Moreover, we have no doubt that Noling was the actual killer given the abundant evidence against him, such as his own admission to several people that he shot the Hartigs.

**{¶79}** Noling next argues that in view of his age, history, and background, the death penalty is not appropriate. We will consider these claims in connection with our independent sentence evaluation in Part XI, infra.

### B. Duplicative Aggravating Circumstances

**{¶80}** Noling argues in his tenth proposition of law that the trial court erred in not merging the R.C. 2929.04(A)(3) death specifications with the (A)(7) specifications. On appeal, the court of appeals determined that the trial court should have merged these specifications relating to Bearnhardt Hartig, but upheld the trial court's decision not to merge the (A)(3) and (A)(7) specifications as to Cora Hartig.

**{¶81}** This court has stated that "where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, the duplicative aggravating circumstances will be merged for purposes of sentencing." *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus. At times, we have merged (A)(3) and (A)(7) specifications. See, e.g., *State v. Wiles* (1991), 59 Ohio St.3d 71, 84, 571 N.E.2d 97; *Cooey*, 46 Ohio St.3d at 39, 544 N.E.2d 895; *Jenkins*, 15 Ohio St.3d at 197, 15 OBR 311, 473 N.E.2d 264. In some situations, however, we have found that R.C. 2929.04(A)(3) and (A)(7) specifications can properly be viewed as separate and need not be merged. See, e.g., *State v. Sheppard* (1998), 84 Ohio St.3d 230, 232, 242, 703 N.E.2d 286; *State v. Palmer* (1997), 80 Ohio

St.3d 543, 574, 687 N.E.2d 685; *Wogenstahl*, 75 Ohio St.3d at 367, 662 N.E.2d 311.

**{¶82}** In this case, we conclude that the court of appeals correctly upheld the trial court's decision not to merge the (A)(3) and (A)(7) specifications as to Cora Hartig. The facts show a separate motivation and decision to shoot Mrs. Hartig. Noling told Wolcott that after first shooting the "old man," he later shot Cora Hartig because she had "seen them, [and] she could tell the police who they were." Noling would have had to reload his semiautomatic gun before killing Cora Hartig. When asked why he killed them, Noling told Dalesandro that "he didn't want no witnesses." According to Garner, Noling asserted that St. Clair "said [Noling's] name, and so they had to kill both of them."[1] Accordingly, we reject Noling's tenth proposition of law.

### C. Exclusion of Mitigation Evidence

**{¶83}** In his eleventh proposition of law, Noling argues that the trial court erred in excluding the testimony of Jim Aylward, a public defender. Aylward would have explained the meaning of consecutive, concurrent, and life sentences, and the penalties for the firearms specifications. We reject Noling's argument because he forfeited the issue by not asserting it below. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraphs one and two of the syllabus.

**{¶84}** Further, the exclusion of Aylward's testimony does not constitute plain error. Aylward's testimony was not relevant because it did not relate to Noling's history, character or background, the circumstances of the offense, or Noling's "moral culpability." See *Franklin v. Lynaugh* (1988), 487 U.S. 164, 188, 108 S.Ct. 2320, 101 L.Ed.2d 155 (O'Connor, J., concurring). Accord *Treesh*, 90 Ohio St.3d at 463, 739 N.E.2d 749, fn. 1 (exclusion of similar expert on effect of firearms specifications); *State v. White* (1999), 85 Ohio St.3d 433,

---

1. Because the state did not appeal, the court of appeals' decision to merge the (A)(3) and (A)(7) specifications as to Mr. Hartig stands.

447, 709 N.E.2d 140 (court can exclude expert testimony about length of life sentence in aggravated murder case including effect of firearms specifications); *State v. Williams* (1996), 74 Ohio St.3d 569, 660 N.E.2d 724, paragraph two of the syllabus (exclusion of attorney's testimony as to meaning of the lack of significant criminal history). Noling has thus failed to satisfy at least the first prong of our plain-error inquiry in that he has failed to identify an error.

{¶85} Moreover, we note that Noling's counsel explained to the jury without objection that Noling faced at least 29 or 39 years in prison because of the gun specifications. The jury knew that Noling faced lengthy imprisonment and nonetheless chose the death penalty.

{¶86} We accordingly overrule the eleventh proposition of law.

### D. Penalty-phase Instructions

{¶87} Noling argues in connection with his twelfth proposition of law that the sentencing instructions were flawed in failing to (1) delineate evidence relevant to the aggravating circumstances; and (2) direct the jury to consider only aggravating circumstances relevant to each murder count. In his thirteenth proposition of law, Noling then argues that the trial court erred in failing to instruct the jury that a single juror could force the imposition of a life sentence.

{¶88} Noling never objected on these grounds at trial, nor did he request other instructions. His failure to object "constitutes a waiver * * *, unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Noling also failed to raise these issues before the court of appeals. Because the trial court's penalty instructions did not involve plain error, we reject these propositions of law.

### VI. Prosecutorial Misconduct

{¶89} In his fourteenth proposition of law, Noling complains about prosecutorial misconduct, but Noling objected on only some points at trial. Also,

Noling raised misconduct issues at the court of appeals relating only to the prosecutor's peremptory challenges and penalty-phase arguments, namely, comments about Noling's age, the harm to the Hartigs, sympathy, and a personal opinion on the penalty. Thus, waiver, or forfeiture, applies. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus. Noling's complaints also lack merit.

## A. Peremptory Challenges

{¶90} Noling argues that the state improperly used peremptory challenges against jurors who were hesitant to impose the death penalty. This court has held that prosecutors may use peremptory strikes against prospective jurors who are hesitant about the death penalty. See *State v. Cook* (1992), 65 Ohio St.3d 516, 518, 605 N.E.2d 70; *State v. Evans* (1992), 63 Ohio St.3d 231, 249, 586 N.E.2d 1042. By failing to identify an error, Noling has thus failed to satisfy the first prong of our plain-error inquiry.

## B. Prosecutor's Guilt-phase Closing

{¶91} Noling claims that remarks in the prosecutor's guilt-phase argument were improper. Whether a prosecutor's remarks constitute misconduct requires analysis as to (1) whether the remarks were improper, and (2) if so, whether the remarks prejudicially affected an accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. Accord *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293. The touchstone of this analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶92} Here, the prosecutor did not create plain error by declaring, without objection, that the gun Noling used to kill the Hartigs carried six bullets. Extended magazines for a .25 caliber semiautomatic pistol are uncommon; .25 caliber guns generally hold only six or seven shells, and ten shells from the same weapon were found at the scene. According to Wolcott, Noling had two clips for

the murder weapon on his way to the scene. Thus, the prosecutor's theory that Noling reloaded the weapon is a fair inference based on the evidence. See *State v. Richey* (1992), 64 Ohio St.3d 353, 362, 595 N.E.2d 915.

{¶93} Further, the prosecutor's assertion, over defense objection, that "these people cannot tell you what happened, they are dead," was a brief truism of no particular significance. See *Biros*, 78 Ohio St.3d at 454, 678 N.E.2d 891 (remark that victim could not testify was "a rather obvious fact of which everyone was already aware" and not prejudicial). Similarly, the prosecutor's statement that "the State doesn't pick its witnesses, we're not going to have fine upstanding witnesses at scenes like this. * * * [B]irds of a feather fly together" was also of no particular significance. The prosecutor simply pointed out that the state did not choose the witnesses, events did. Instead of arguing "guilt by association," the prosecutor was attempting—without defense objection—to excuse the unsavory character of the state's own witnesses.

{¶94} Additionally, the prosecutor's unfinished remark that "if the defendant failed to demonstrate or [in] any way, shape or form explain [the evidence]" did not constitute a comment on Noling's failure to testify. A prosecutor's reference to "uncontradicted evidence is not a comment on the accused's failure to testify." *State v. Ferguson* (1983), 5 Ohio St.3d 160, 5 OBR 380, 450 N.E.2d 265, paragraph one of the syllabus. Accord *State v. Webb* (1994), 70 Ohio St.3d 325, 329, 638 N.E.2d 1023. Moreover, isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431. Rather, an appellate court must review a closing argument in its entirety to determine whether prejudicial error exists. *Frazier*, 73 Ohio St.3d at 342, 652 N.E.2d 1000. Even construing the prosecutor's remark as misconduct, it lacks prejudicial effect warranting reversal because the court sustained Noling's objection.

{¶95} The court's instructions also negated any potential prejudice arising from improprieties in the prosecutor's argument. The court instructed the jury on the presumption of innocence, the state's burden of proof, and reasonable doubt. It further instructed the jurors that counsel's statements, counsel's arguments, and stricken statements were not evidence and cautioned them not to speculate on an unanswered question or why an objection was sustained. We conclude that no prejudicial error warranting reversal occurred.

### C. Penalty-phase Questioning

{¶96} Noling argues that the prosecutor improperly questioned the defense psychologist, Dr. Jeffrey Smalldon, about "a witness list from the defendant of approximately forty names." Over objection, the prosecutor asked Dr. Smalldon if he had contacted everyone on the witness list. Dr. Smalldon said that he had not seen the list, and shortly thereafter the trial court declared that the prosecutor could not comment about witnesses not called to testify.

{¶97} Here, the prosecutor attempted to cross-examine Dr. Smalldon by suggesting that his opinions were based on limited information because Dr. Smalldon had not interviewed a number of individuals who presumably knew about Noling. The prosecutor improperly brought before the jury the topic of the defense witness list. See, e.g., Crim.R. 16(C)(3) ("The fact that a witness' name is on a list * * * and that the witness is not called shall not be commented upon at the trial"). Accord *State v. Hannah* (1978), 54 Ohio St.2d 84, 90, 8 O.O.3d 84, 374 N.E.2d 1359 (commenting on absence of alibi witness is error). We find no prejudice in the prosecutor's reference to the witness list in light of the overall events at trial and the abundant evidence against Noling.

{¶98} Noling also argues that the prosecutor improperly cross-examined defense witnesses because Noling did not raise the (B)(3) mitigating factor. Noling claims that the prosecutor could not ask witnesses, such as Dr. Smalldon, whether Noling understood the consequences of his actions and knew right from

wrong. Noling is wrong. Dr. Smalldon testified that Noling had an antisocial personality disorder, a learning disability, and a hyperactivity disorder or "brain disorder." A prosecutor can legitimately examine the parameters of defense mitigation evidence, including cross-examining a defense psychologist. See *State v. Green* (2000), 90 Ohio St.3d 352, 374, 738 N.E.2d 1208. Here, the prosecution's questions enabled the jury to place in context and understand the complex defense psychological testimony presented. Whether Noling understood the difference between right and wrong and that what he did was wrong was indeed relevant.

### D. Prosecutor's Penalty-phase Argument

{¶99} Noling claims misconduct in the prosecutor's sentencing argument. But, as we note, Noling on occasion failed to object and on those points waived all but plain error.

{¶100} First, the prosecutor did improperly suggest, over unsuccessful objection, that Noling's "two-day crime spree" was an aggravating circumstance. See, e.g., *Green*, 90 Ohio St.3d at 362, 738 N.E.2d 1208 (other offenses are "not relevant to the specified aggravating circumstance"). This remark could not be said to have prejudiced Noling, given the court's instruction as to the aggravating circumstances to be considered. And evidence of the two-day crime spree was properly before the jury.

{¶101} In contrast, the prosecutor could appropriately refer to the facts of the offense, namely, the plan to commit the crime, the extra ammunition clip, the ransacking of the Hartigs' home, the disposal of the weapon, and the fact that the Hartigs were "old and helpless." "The facts [of an offense] are relevant in determining whether the nature and circumstances of the offense are mitigating." *Green*, 90 Ohio St.3d at 374, 738 N.E.2d 1208, citing *Lorraine*, 66 Ohio St.3d at 420, 613 N.E.2d 212. Moreover, "both the criminal *and his crime* are properly

considered in determining the propriety of imposing a death sentence." (Emphasis sic.) Id., quoting *State v. Hill* (1996), 75 Ohio St.3d 195, 200, 661 N.E.2d 1068.

{¶102} The prosecutor's comments that the crime was "scary" because it involved a home invasion, that the crime "horrified" the community or "frightens us," and that Noling should not be allowed to walk the streets again were fair comments. "Prosecutors can be 'colorful or creative.' " *Wilson*, 74 Ohio St.3d at 399, 659 N.E.2d 292, citing *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523. Moreover, Noling did not object, and because no prejudicial error resulted from such comments, Noling has failed to satisfy at least the third prong of our plain-error inquiry.

{¶103} Nor did the prosecutor err by arguing that mitigation evidence, unrelated to the crime, should be given little weight. "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *Wilson*, 74 Ohio St.3d at 399, 659 N.E.2d 292. "The fact that * * * evidence is admissible * * * does not automatically mean that it must be given any weight." *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus.

{¶104} Equally permissible was the prosecutor's comparing Noling with his siblings who had an identical family background. Even though evidence concerning his siblings was scarce, some evidence exists in the record. Because Noling sought to mitigate his offenses by relying on his family background, the state could argue that others who had the same family background had not committed comparable crimes. See, e.g., *State v. Campbell* (2000), 90 Ohio St.3d 320, 343, 738 N.E.2d 1178 (court did not err by comparing law-abiding siblings from same abusive home to defendant); *Wilson*, 74 Ohio St.3d at 399, 659 N.E.2d 292 (arguing that others with deprived backgrounds do not commit such crimes was not error).

{¶105} The prosecutor's brief comment that mitigation did not outweigh Noling's crimes did not impermissibly shift the burden of proof. The trial court's instructions, counsel's argument, and the verdict form clearly reflected the state's burden of proof. Moreover, Noling did not object.

{¶106} Finally, Noling's complaint that reversible error exists because the prosecutor expressed a personal opinion that death was the appropriate punishment lacks merit. On three occasions, the court sustained defense objections to comments by the prosecutor that might be construed as a personal opinion on the death penalty. The prosecutor then rephrased his argument, and no prejudicial error resulted from these inartful comments. Although limits exist, " 'it is difficult for prosecutors to argue vigorously for the death penalty without making what might arguably be statements of personal opinion.' " *State v. Durr* (1991), 58 Ohio St.3d 86, 96, 568 N.E.2d 674, quoting *Tyler*, 50 Ohio St.3d at 41, 553 N.E.2d 576.

{¶107} Noling received a fair trial, and prosecutorial misconduct did not permeate the trial. Nor did any misconduct deprive Noling of his right to a fair and individualized sentencing determination. We therefore reject his fourteenth proposition of law.

## VII. Ineffective Assistance of Counsel

{¶108} Noling argues in his fifteenth proposition of law that his counsel inadequately investigated his case, failed to question jurors about pretrial publicity, failed to make necessary objections to charges, instructions, and prosecutorial misconduct, and argued ineffectively to the jury. Reversal of convictions on ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. "To establish

prejudice, 'the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.' " *Tibbetts*, 92 Ohio St.3d at 164, 749 N.E.2d 226, quoting *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶109} Noling has forfeited his claim that trial counsel were ineffective, however, because his appellate counsel did not raise that issue before the court of appeals. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

{¶110} In any event, we find that his claims lack merit. For example, as discussed in connection with his eighth proposition of law, the use of ambiguous language—"Robbery and/or Burglary" in the death specifications—did not affect Noling's rights. See *Keene*, 81 Ohio St.3d at 664, 693 N.E.2d 246. The failure to object to this language does not constitute ineffective assistance.

{¶111} Nor does Noling establish either deficient performance or prejudice when he argues that his counsel did not adequately voir dire juror Renfroe about pretrial publicity. Renfroe never stated that he had read or knew about the case, only that he was "glancing through the newspaper" and noticed jury selection had been cancelled the previous week. Counsel made a reasoned tactical decision not to question Renfroe further, and "we will not second-guess trial strategy decisions such as those made in voir dire." *State v. Cornwell* (1999), 86 Ohio St.3d 560, 569, 715 N.E.2d 1144, citing *State v. Mason* (1998), 82 Ohio St.3d 144, 157, 694 N.E.2d 932. Further, Noling has not explained adequately how this decision prejudiced him. See *Mason*, 82 Ohio St.3d at 157-158, 694 N.E.2d 932.

{¶112} Noling also argues that his counsel inadequately investigated the possibility of another pretrial agreement between Dalesandro and the state. That possibility, however, was discussed at trial. And because the record before us does not show what investigation Noling's counsel undertook, we cannot say that

it reveals this alleged error. See *State v. Nields* (2001), 93 Ohio St.3d 6, 35, 752 N.E.2d 859, citing *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Sanders* (2001)*,* 92 Ohio St.3d 245, 274, 750 N.E.2d 90. Nor does the record show any prejudice arising from any such inquiry or lack thereof. We therefore reject Noling's claims in this regard as speculative.

{¶113} Noling's claims of ineffective assistance for failure to object to alleged prosecutorial misconduct also lack merit. As discussed in connection with Noling's fourteenth proposition of law, see Part VI, supra, Noling had no basis to object to the state's peremptory challenges or to the state's guilt-phase or sentencing arguments. Thus, Noling has not established either deficient performance or prejudice. Cf. *Tibbetts*, 92 Ohio St.3d at 155, 749 N.E.2d 226 (there is no ineffective assistance where none of the challenged statements would warrant reversal). In contrast, Noling's counsel preserved his claim of error as to the prosecutor's cross-examination of St. Clair as previously discussed.

{¶114} Equally unsuccessful are Noling's claims that counsel were ineffective for failing to object to the guilt-phase or penalty instructions. Counsel's decisions represented reasonable professional judgment. See our discussion on propositions of law nine, twelve, thirteen, and twenty. Additionally, Noling offers no basis to find that if he had objected, a "reasonable probability" exists that the trial result would have been different. *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶115} We similarly reject Noling's complaint that his counsel discussed punishment in his opening statement. Counsel simply made a tactical decision to explain the voir dire death-qualification process that had just been concluded. "[A] strong presumption [exists] that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. And Noling has failed to demonstrate how counsel's choice prejudiced his case.

**{¶116}** Noling further argues that his counsel inaccurately described the jury's role by asking the jury to acquit if it doubted "the honesty of the State's case." Noling claims that his counsel's argument was inflammatory, attacked the prosecutor's integrity, and trivialized reasonable doubt. Noling's arguments lack merit, however, because they accord unreasonable interpretations to phrases employed by counsel, interpretations that no reasonable juror would have made. By referring to the honesty of the case, counsel simply questioned the credibility of the state's witnesses.

**{¶117}** In sum, we reject Noling's fifteenth proposition of law. At trial, Noling had competent and thorough lawyers who fought hard for their client. We find neither deficient performance nor prejudice as required by *Strickland*.

VIII. Trial Court's Sentencing Hearing and Opinion

A. Sentencing Hearing

**{¶118}** In his sixteenth proposition of law, Noling argues that victim-impact evidence requires vacation of his death sentence. Specifically, Noling complains that after the jury's death-penalty verdict, Wilton Treesh, a Hartig family representative, asked the trial court to follow the jury's death-penalty recommendation. This argument is without merit.

**{¶119}** The United States Constitution does not prohibit victim-impact evidence in capital cases. *Payne v. Tennessee* (1991), 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720. This court has held, however, that "[e]xpressions of opinion by a witness as to the appropriateness of a particular sentence in a capital case violate" a defendant's rights. *State v. Huertas* (1990), 51 Ohio St.3d 22, 553 N.E.2d 1058, syllabus. The same principle applies to family representatives who express opinions about the penalty at sentencing hearings. See *State v. Goodwin* (1999), 84 Ohio St.3d 331, 343, 703 N.E.2d 1251; *Fautenberry*, 72 Ohio St.3d at 439, 650 N.E.2d 878.

**{¶120}** Here, the remarks about which Noling complains do not require reversal. Not only did Noling fail to object to Treesh's remarks, but the jury never heard the opinion. Rather, Treesh's remarks were directed only to the trial judge. We have explained that "where such opinion is expressed to the judge only, as was the case here, it is not reversible error unless there is some indication that the judge *actually considered it* in sentencing the defendant to death." (Emphasis added.) *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 88, citing *Fautenberry*, 72 Ohio St.3d at 439, 650 N.E.2d 878. Noling has failed to identify evidence suggesting that the trial judge *actually* considered the remarks. Absent evidence of actual consideration, we must presume that the trial judge remained uninfluenced in sentencing Noling because his sentencing decision never referred to Treesh's opinion. Cf. *Treesh*, 90 Ohio St.3d at 486, 739 N.E.2d 749; *State v. Allard* (1996), 75 Ohio St.3d 482, 488-492, 663 N.E.2d 1277; *Fautenberry*, 72 Ohio St.3d at 439, 650 N.E.2d 878.

### B. Sentencing Opinion

**{¶121}** In his seventeenth proposition of law, Noling argues that the trial court erred in considering duplicative aggravating circumstances and improper evidence in its sentencing opinion. He also complains that the trial court failed to consider significant mitigating evidence. We conclude that this proposition presents no reversible error for the following reasons.

**{¶122}** First, contrary to Noling's arguments, the R.C. 2929.04(A)(3) and (A)(7) death specifications are separate aggravating circumstances as to the murder of Cora Hartig. See Part V(B), supra. As to the aggravated murder of Bearnhardt Hartig, the court of appeals determined the (A)(3) and (A)(7) should have been merged, but independently reassessed the sentence in light of that error. The court of appeals thus corrected this asserted deficiency in the trial court's opinion.

**{¶123}** Second, although the trial court may have improperly cited impeachment evidence of St. Clair as substantive evidence in describing exactly what occurred inside the Hartig home, any such error failed to prejudice Noling. That court's sentencing opinion noted that "[t]he defendant held * * * the Hartigs in the kitchen area * * * while St. Clair ransacked the bedrooms * * *. At some point, St. Clair heard shooting and ran from the bedroom to see Noling shooting Mrs. Hartig." We agree that no direct evidence of those events is in the record. Nonetheless, we find that any error was harmless given that other evidence established that Noling personally shot the Hartigs, and the jury found that he was the principal offender. See Parts IV(A) and V(B), supra.

**{¶124}** Third, Noling is wrong in arguing that the trial court misconstrued the role that mitigation plays in sentencing and failed to consider relevant mitigating evidence. The trial court's decision that Noling's history, character, or background did not mitigate the offenses was within its discretion. "[T]he assessment and weight to be given mitigating evidence are matters for the trial court's determination." *Lott*, 51 Ohio St.3d at 171, 555 N.E.2d 293. Accord *Bey*, 85 Ohio St.3d at 504, 709 N.E.2d 484; *State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124. See, also, *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph two of the syllabus.

**{¶125}** The trial court's use of terms such as "explain," "justify," or "lessen" does not demonstrate constitutional error in the evaluation of mitigation evidence. As this court held in *Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus, "The fact that an item of evidence is admissible under R.C. 2929.04(B)(7) does not automatically mean that it must be given any weight." Finally, our "independent review of a sentence will cure any flaws in the trial court's opinion." *Fox*, 69 Ohio St.3d at 191, 631 N.E.2d 124. Accord *McGuire*, 80 Ohio St.3d at 395, 686 N.E.2d 1112; *Hill*, 75 Ohio St.3d at 210, 661 N.E.2d 1068.

**{¶126}** We overrule proposition of law seventeen.

IX. Court of Appeals' Sentencing Opinion

**{¶127}** Noling complains in his eighteenth proposition of law about the court of appeals' sentencing opinion, including its independent review of Noling's death sentence. We reject his arguments as meritless.

**{¶128}** First, Noling argues that the court of appeals relied on nonstatutory aggravating circumstances and points to references about Noling's "plan to steal from the weak and infirm," Noling's other robberies, and his prior discharge of a firearm. The context shows that, in referring to these circumstances, the appellate court was evaluating Dr. Smalldon's testimony, not piling on aggravating factors. Moreover, the court of appeals precisely defined the aggravating circumstances. This court has held that "[w]hen a court correctly identifies the aggravating circumstances in its sentencing opinion, we will presume that the court relied only on those circumstances and not on nonstatutory aggravating circumstances." *Clemons*, 82 Ohio St.3d at 447, 696 N.E.2d 1009, citing *State v. Hill* (1995), 73 Ohio St.3d 433, 441, 653 N.E.2d 271. Noling presents us with no persuasive reason to stray from that presumption here.

**{¶129}** Second, Noling claims that the court of appeals "appears to penalize [him] for his failure to meet the arduous standard" in R.C. 2929.04(B)(3). We reject this claim. The context of the opinion shows that the court of appeals was evaluating Dr. Smalldon's testimony and granting it mitigating weight, but also pointing out that this testimony failed to establish any mental disease or defect within the meaning of R.C. 2929.04(B)(3). The opinion never implied that Noling was punished for not meeting that standard, and we regard Noling's contrary inference as incorrectly drawn.

**{¶130}** Third, Noling argues that the court of appeals improperly minimized mitigation evidence. It is apparent from the record, however, that the court of appeals carefully reviewed the sentence and expressed its views in a 13-

page independent evaluation. Further, we have held that " '[a] decisionmaker need not weigh mitigating factors in a particular manner. The process * * * as well as the weight, if any, to assign a given factor is a matter for the discretion of the individual decisionmaker.' " *Taylor*, 78 Ohio St.3d at 31-32, 676 N.E.2d 82, quoting *Fox*, 69 Ohio St.3d at 193, 631 N.E.2d 124. Accordingly, this argument also lacks merit.

{¶131} Fourth, Noling's claim that the court of appeals placed the burden of proof as to sentencing on him also lacks merit. The appellate court's comment that Noling's "age and background [do] not overcome the enormous weight of the aggravating circumstances" in context does not reflect misunderstanding of the state's burden of proof. The court of appeals correctly noted the burden in numerous references.

{¶132} Finally, in regard to the foregoing arguments, we note that our independent sentence evaluation will readily correct any deficiencies in the court of appeals' opinion. See, e.g., *Phillips*, 74 Ohio St.3d at 102, 656 N.E.2d 643; *Frazier*, 73 Ohio St.3d at 343, 652 N.E.2d 1000.

## X. Ineffective Assistance of Appellate Counsel

{¶133} In proposition of law nineteen, Noling points to examples of claimed ineffective assistance of appellate counsel. As with claims of ineffective trial counsel, reversal for ineffective assistance of appellate counsel also requires demonstration of deficient performance and prejudice. See, e.g., *Strickland*, 466 U.S. at 669, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Spivey*, 84 Ohio St.3d at 25, 701 N.E.2d 696; *State v. Reed* (1996), 74 Ohio St.3d 534, 535, 660 N.E.2d 456.

{¶134} There is no ineffective assistance of appellate counsel here. Appellate counsel raised 15 primary issues before the court of appeals, many with subparts, and strongly argued their case. It is well settled that appellate counsel have no constitutional duty to raise every nonfrivolous issue. *Jones v. Barnes* (1983), 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987. Rather, appellate

counsel can make a reasoned tactical judgment not to raise issues that lack substantial merit.  See, e.g., our discussion on propositions of law one, four, eleven, seventeen, supra.

{¶135} Moreover, as to issues Noling argues that his counsel should have raised, no "reasonable probability" of a different result exists even if counsel had raised those claims before the court of appeals.  *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.  See, e.g., our discussion on propositions of law two, fourteen, and fifteen.  Thus, we reject proposition of law number nineteen.

XI. Independent Sentence Evaluation

{¶136} Having rejected each of Noling's propositions of law, we now turn to our statutory duty to independently weigh the aggravating circumstances against the mitigating factors and to determine whether Noling's sentence is disproportionate to sentences in similar cases.  R.C. 2929.05(A).

A. Penalty-phase Evidence

{¶137} At the penalty phase of the trial, Noling presented testimony about his history, character, and background from his mother, sister, other relatives, and friends, as well as from Dr. Jeffrey Smalldon, a clinical psychologist.  We summarize that testimony as follows.

{¶138} Judith Mann, Noling's mother, was married to Gary Noling for ten years.  She had four children with him, including Noling, who was born in 1972.  Although Gary Noling was an alcoholic, he worked steadily, but the marriage broke up when Noling was less than one year old.  Judith later married Wayne Allen, also an alcoholic; this union also ended in divorce.  Wayne was cruel to Noling, and his father, Gary, expressed little interest in Noling and rarely visited.

{¶139} As a child, Noling was a hyperactive slow learner, had problems in school for stealing and truancy, and spent time in detention and in group homes.  In 1986, he was adjudged a delinquent for petty theft, felony theft, and breaking

and entering. In 1988, he was adjudged a delinquent for criminal trespass, aggravated burglary, and assault, and in 1989, he was found delinquent for assault, criminal trespass, and obstructing justice.

{¶140} Diana Riggs, Noling's sister, confirmed that their mother had raised the children on welfare and that her alcoholic father did not support them. Her mother suffered from depression and a variety of ailments.

{¶141} Scott Brahler, Noling's cousin, recalled playing baseball, football, and other sports with Noling, and that Noling was fine when he visited. Scott was very surprised that Noling had committed these crimes and believes that Noling's life is worth saving. Dexter Neiswanger, another of Noling's cousins, grew up with him, loves him, and would not want Noling to receive the death penalty. Jane Brahler, Noling's aunt, described Noling as a well-behaved child, a "sweet kid" who lacked a father figure. She never thought that Noling "could ever, ever do such a thing." She stated that Noling will always have "a place in [her] heart, always did and always will." Orm Smith, Noling's uncle, recalled when Noling's father "was smacking the heck out of his mother," and he stopped it. While growing up, Noling lacked discipline, love, and affection, and was not treated fairly.

{¶142} Sue Ann Dangel and James Dangel manage a campground in Wooster and employed Noling one summer for four or five months when Noling was 14 to 15 years old. Noling then lived at a Christian children's home where a juvenile court had placed him. Noling was a good worker, did a wide variety of tasks, was honest and trustworthy, got along well with everyone, and was fun to be around. Both were shocked that Noling had committed these crimes. David Miller, a social worker, was Noling's therapist at the children's home. When Noling first arrived, he was "agitated" and "very belligerent," but reportedly began to do well in a structured and controlled environment.

{¶143} Dr. Jeffrey Smalldon, a psychologist, evaluated Noling, related his family history to the jury, and reported that as a child Noling was hyperactive, suffered from attention deficit disorder, and had a learning disability. As an adolescent, Noling was mouthy, defiant, and difficult. After a juvenile court declared Noling unruly, that court placed him in the children's home in Wooster for a year. Then he returned to live with his mother, the old problems resurfaced, and for a while Noling lived with his father, which did not work out.

{¶144} When Noling was nine or ten years old, he first got into trouble with the law for theft and was arrested for a variety of offenses as an adolescent. School records reflected that Noling was unruly, frequently involved in fights and verbal altercations, and difficult to control. Noling experimented with drugs when he was 11 to 13 years old, tried hard drugs, and had a history of marijuana abuse. In 1990, when Noling was 18, he was sentenced to prison for aggravated robbery (which involved the "other acts" offenses discussed supra).

{¶145} Dr. Smalldon concluded that Noling suffered from "dysthymia," which is "a longstanding depressive condition." His depression manifested in "acting out behavior." His overall IQ has consistently tested in the 85 to 90 range, but he gets over 100 in nonverbal skills and only around 80 in verbal skills. Noling has "tremendous difficulty with abstract thinking," and a "very flawed" conceptual understanding. Noling suffers from an antisocial personality disorder, which is an enduring pattern of thinking, emotions, feelings, and inter-personal behavior. One psychiatrist described him as a 22-year-old man "with the inner controls of a two year old child." He noted that Noling could adjust reasonably well in prison where he has "a great deal of structure and consistency."

{¶146} In an unsworn statement, Noling declared that he was "willing to accept any responsibility [for] what I have done and that I'm very sorry. * * * I just beg [you] from the bottom of my heart that you spare my life."

B. Sentence Evaluation

{¶147} After independent assessment, we determine that the evidence proves the aggravating circumstances—that Noling murdered Bearnhardt Hartig during an aggravated burglary and an aggravated robbery, R.C. 2929.04(A)(7), and killed Cora Hartig to escape detection or apprehension, R.C. 2929.04(A)(3), and in the course of an aggravated burglary and an aggravated robbery, (A)(7). Because the form of the specification charged "aggravated robbery and/or aggravated burglary," we deem it appropriate to treat the felony-murder specification as a single specification in each count. See our discussion in Part III(A), supra.

{¶148} In regard to mitigation, there are no mitigating features in the nature and circumstances of the offense. In the course of a home-invasion robbery, Noling murdered an elderly couple by repeatedly shooting them. Nor does Noling's character offer mitigating features. There are modest mitigating features, however, in Noling's history and background. Noling grew up in an unstructured home; his mother suffered chronic illnesses, and his father, an alcoholic, abandoned the family. His stepfather was abusive. Noling was in trouble throughout his teenage years and developed an antisocial personality disorder, an attention deficit disorder, and a learning disability.

{¶149} As to statutory mitigating factors, we conclude that the statutory factors in R.C. 2929.04(B)(1) to (B)(3), (B)(5), and (B)(6) are not applicable. Under R.C. 2929.04(B)(7) ("other factors"), we consider as mitigating factors Noling's remorse as expressed in his unsworn statement, the love and concern of his relatives, his learning disability, his antisocial personality disorder, and his adaptability to a structured environment. We also recognize that Noling's age is a mitigating factor, R.C. 2929.04(B)(4), because he was born on March 22, 1972, and was just two weeks past his 18th birthday when the offenses occurred. We do not, however, necessarily regard age as a strong or compelling mitigating factor. This court upheld the death penalty in the following cases when the defendants

committed murder at the age of 18. *Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 98; *Carter*, 89 Ohio St.3d at 611, 734 N.E.2d 345; *State v. Raglin* (1998), 83 Ohio St.3d 253, 273, 699 N.E.2d 482; *State v. Dennis* (1997), 79 Ohio St.3d 421, 438, 683 N.E.2d 1096; *State v. Slagle* (1992), 65 Ohio St.3d 597, 613, 605 N.E.2d 916; *State v. Hill* (1992), 64 Ohio St.3d 313, 335, 595 N.E.2d 884.

**{¶150}** After weighing the aggravating circumstances against the collective mitigating evidence, we have concluded beyond a reasonable doubt that the aggravating circumstances as to each aggravated murder count outweigh those collective mitigating factors. In the course of a brutal home-invasion robbery, Noling repeatedly shot and killed elderly people. Moreover, Noling planned the burglary and robbery and took other youths along to participate in these brutal crimes.

**{¶151}** We hold that the death penalty is proportionate when compared with other aggravated murders committed during the course of an aggravated burglary and an aggravated robbery. See, e.g., *State v. Jones* (2000), 90 Ohio St.3d 403, 739 N.E.2d 300; *State v. Stallings* (2000), 89 Ohio St.3d 280, 731 N.E.2d 159; *Spivey*, 81 Ohio St.3d 405, 692 N.E.2d 151; *Berry*, 72 Ohio St.3d 354, 650 N.E.2d 433; *Slagle*, 65 Ohio St.3d 597, 605 N.E.2d 916; *State v. Murphy* (1992), 65 Ohio St.3d 554, 605 N.E.2d 884; *Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293; and *Barnes*, 25 Ohio St.3d 203, 25 OBR 266, 495 N.E.2d 922.

**{¶152}** We further hold that the death penalty is also proportionate when compared with cases involving killings to escape detection. See, e.g., *Sheppard*, 84 Ohio St.3d 230, 703 N.E.2d 286; *State v. Burke* (1995), 73 Ohio St.3d 399, 653 N.E.2d 242.

## XII. Conclusion

**{¶153}** For the foregoing reasons, we conclude that none of Noling's propositions of law has merit. We have also independently weighed the

aggravating circumstances against the mitigating factors as to each murder victim and have considered the proportionality of the death sentence. We affirm the judgment of the court of appeals and the death sentence imposed against Noling.

Judgment affirmed.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

_____

APPENDIX

{¶154} Proposition of Law No. 1: Where a trial court precludes a capital defendant from cross-examining a witness about a strong motive to fabricate testimony, the trial court deprives that capital defendant of his confrontation and due process rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article 1 §§ 10 and 16 of the Ohio Constitution.

{¶155} Proposition of Law No. 2: A trial court abuses its discretion when it declares a witness hostile without the showing required by Ohio Rule of Evidence 607. Further, when a trial court permits a witness to be impeached pursuant to Rule 607, the trial court has an obligation to control the nature and extent of that cross-examination. The trial court's failure to do either violates a capital defendant's due process rights as guaranteed by the Fourteenth Amendment of the United States Constitution and § 16, Article I of the Ohio Constitution.

{¶156} Proposition of Law No. 3: Where evidence of other crimes lacks a distinct behavioral fingerprint, such evidence is inadmissible. Even where such evidence may be admissible, undue emphasis on it may prejudice a capital defendant's right to a fair trial and reliable death sentence. U.S. Const. Amends. V, VI, VIII, and XIV.

{¶157} Proposition of Law No. 4: A capital defendant's conviction cannot stand where it is against the manifest weight of the evidence. To allow such a conviction to stand violates a capital defendant's due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, § 16 of the Ohio Constitution.

{¶158} Proposition of Law No. 5: This death penalty is inappropriate and in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as Article I, §§ 9, 10 and 16 of the Ohio Constitution.

{¶159} Proposition of Law No. 6: Where the trial court admits victim impact evidence during the trial phase unrelated to the crimes, a capital defendant's rights as guaranteed [by the] Fourteenth Amendment to the United States Constitution and Article I, §§ 16 are violated.

{¶160} Proposition of Law No. 7: The state may not obtain a conviction for an offense where the indictment for that offense fails to include an essential element of the offense. To do so offends fundamental due process. U.S. Const. Amend. XIV and Article I, §§ 10 and 16 of the Ohio Constitution.

{¶161} Proposition of Law No. 8: A verdict that a defendant committed felony murder based on the charge that the murder was committed during an "Aggravated Robbery and/or Aggravated Burglary" cannot stand because it is duplicitous. This charge also deprives a defendant of his constitutional right to a unanimous jury verdict. U.S. Const. Amends. V, VI, and XIV.

{¶162} Proposition of Law No. 9: Reversible error occurs when the trial court instructions on *mens rea* relieve or reduce the state's burden of proof. U.S. Const. Amend. XIV.

{¶163} Proposition of Law No. 10: The trial court's failure to merge duplicative aggravating circumstances prior to the sentencing phase of a capital trial deprives a capital defendant of the Eighth Amendment's protection against cruel and unusual punishment and his due process rights as guaranteed by the

Eighth and Fourteenth Amendment rights the United States Constitution and §§ 9 and 16, Article I of the Ohio Constitution.

{¶164} Proposition of Law No. 11: When the trial court precludes a capital defendant from pursuing and presenting relevant mitigation evidence, a capital defendant's rights to a fair sentencing proceeding and individualized sentencing as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and §§ 9 and 16, Article [I] of the Ohio Constitution are violated. Moreover, when that evidence is relevant to rebut prosecutorial argument, the trial court's prohibition deprives a capital defendant of his right to a meaningful opportunity to rebut the state's case as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, § 16 of the Ohio Constitution.

{¶165} Proposition of Law No. 12: Where penalty phase instructions allow the jury to decide what evidence is admissible concerning the aggravating circumstances and where the instructions do not conform to Ohio and federal law, reversal is required. Furthermore, the trial court must instruct the jury during the penalty phase of a capital trial to only consider those aggravating circumstances attached to each count of aggravated murder in conducting the weighing process for that count. U.S. Const. Amend. VI, VIII and XIV; Ohio Const.Art. I, § 9, 10, and 16.

{¶166} Proposition of Law No. 13: A capital defendant is denied his rights against cruel and unusual punishment and due process when his sentencing jury is told that its life sentence recommendation must be unanimous. The capital defendant's right to the effective assistance of counsel is also violated when such instruction is not objected to at trial or raised on a first appeal of right. U.S. Const. Amend. V, VI, VIII, XIV.

{¶167} Proposition of Law No. 14: A capital defendant is denied his substantive and procedural due process rights to a fair trial as guaranteed by the

Eighth and Fourteenth Amendments to the United States Constitution, as well as Article I §§ 9 and 16 of the Ohio Constitution when a prosecutor commits acts of misconduct during voir dire, the trial phase and the sentencing phase of his capital trial. He is also denied his right to reliable sentencing as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 9 and 16 of the Ohio Constitution.

{¶168} Proposition of Law No. 15: When trial counsel fail to voir dire on pretrial publicity, fail to object to prosecutor misconduct, fail to object to improper instructions, fail to follow up on issues of impeachment and argue penalty during their trial phase opening statement, a capital defendant is deprived of the right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution.

{¶169} Proposition of Law No. 16: Where the trial court admits victim impact evidence in the nature of a family member's request that a capital defendant be sentenced to death, a capital defendant's rights as guaranteed by the Eight[h] and Fourteenth Amendments to the United States Constitution and Article I, §§ 9 and 16 are violated.

{¶170} Proposition of Law No. 17: Reversible error occurs when the trial court's sentencing opinion fails to merge duplicative aggravating circumstances, relies on facts not properly in evidence, and fails to consider significant mitigating evidence. U.S. Const. Amends. VIII and XIV.

{¶171} Proposition of Law No. 18: When the appellate court considers nonstatutory aggravating circumstances, evaluates mitigation evidence under improper standards, minimizes mitigation evidence, and burden shifts, the court's independent sentence review fails to focus on the individual and a capital appellant is deprived of the right to individualized sentencing and of his liberty interest in the statutory sentencing scheme thus violating rights guaranteed by the

Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 9 and 16 of the Ohio Constitution.

{¶172} Proposition of Law No. 19:   Where appellate counsel fails to render effective assistance in the court of appeals, a capital defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article I, § 16 of the Ohio Constitution is violated.

{¶173} Proposition of Law No. 20:   A capital defendant's right to due process under the Fourteenth Amendment to the United States Constitution is violated when the state is permitted to convict upon a standard of proof below proof beyond a reasonable doubt.

{¶174} Proposition of Law No. 21:    Ohio's death penalty law is unconstitutional.   The Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 2, 9, 10, and 16 of the Ohio Constitution establish the requirements for a valid death penalty scheme.   Ohio Rev.Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 (Anderson 1996), do not meet the prescribed Constitutional requirements and are unconstitutional on their face and as applied to Tyrone Noling.    Further, Ohio's death penalty statute violates the United States' obligations under international law.

_____

Victor V. Vigluicci, Portage County Prosecuting Attorney, and Kelli K. Norman, Assistant Prosecuting Attorney, for appellee.

David J. Bodiker, Ohio Public Defender, Stephen A. Ferrell and Kelly L. Culshaw, Assistant Public Defenders, for appellant.

_____