[Cite as *State v. Tyus*, 2020-Ohio-4454.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 29505 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DONYEA TYUS | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2018-09-3067-B |

DECISION AND JOURNAL ENTRY

Dated: September 16, 2020

CARR, Judge.

{¶1} Defendant-Appellant Donyea Tyus appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Following multiple shootings in the Akron area during the early morning hours of July 7, 2018, an indictment was filed charging Donyea Tyus with two counts of aggravated murder, two counts of murder, two counts of felonious assault, and one count of having weapons while under disability. Firearm specifications accompanied the aggravated murder and murder counts. Donyea Tyus' half-brother, Orlando Tyus, was also charged in relation to the crimes.

{¶3} The matter proceeded to a jury trial at which both Donyea and Orlando Tyus were tried. The jury found Donyea Tyus guilty of the charges. Thereafter, the trial court proceeded to sentencing.

{¶4} Donyea Tyus has appealed, raising four assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

THE VERDICT OF THE TRIAL COURT WAS AGAINST THE MANIFEST
WEIGHT OF THE EVIDENCE[.]

{¶5}    Donyea Tyus argues in his first assignment of error that the verdicts were against

the manifest weight of the evidence.  Donyea Tyus points out that the testimony of Cheyenne

James, who witnessed and participated in the crimes, was crucial to the State's case.  He argues

that the jury misjudged James' credibility and should not have relied upon her testimony.

{¶6}    In determining whether a criminal conviction is against the manifest weight of the

evidence,

> an appellate court must review the entire record, weigh the evidence and all
> reasonable inferences, consider the credibility of witnesses and determine whether,
> in resolving conflicts in the evidence, the trier of fact clearly lost its way and created
> such a manifest miscarriage of justice that the conviction must be reversed and a
> new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶7}    "When a court of appeals reverses a judgment of a trial court on the basis that the

verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and

disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78

Ohio St.3d 308, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).  An appellate court

should exercise the power to reverse a judgment as against the manifest weight of the evidence

only in exceptional cases.  *Otten* at 340.  "[I]n resolving a manifest weight challenge, '[t]his Court

has consistently held that the trier of fact is in the best position to evaluate the credibility of

witnesses and resolve factual disputes.'"  *State v. Moore*, 9th Dist. Summit No. 29418, 2020-Ohio-

3708, ¶ 30, quoting *State v. Boatright*, 9th Dist. Summit No. 28101, 2017-Ohio-5794, ¶ 34, quoting

*State v. Bardos*, 9th Dist. Medina No. 15CA0082-M, 2016-Ohio-8091, ¶ 16.

{¶8} The matter before us involves events that took place over the span of a few hours in the early morning of July 7, 2018 at three separate crime scenes in Akron. The first took place on Schiller Avenue, the second in a parking lot on South Arlington, and the last in an alleyway near 6th Avenue and Minordy Place.

## Schiller Avenue

{¶9} B.R. and his brother were visiting family on Schiller Avenue in Akron on the evening of July 6, 2018 for a blessing ceremony to offer support for an ill family member. The gathering went into the early hours of the morning. The gathering included socializing, eating, and drinking alcohol. Around 3:30 a.m. on July 7, 2018, B.R. and his brother walked to B.R.'s car which was parked along the street. B.R. approached the driver side and B.R.'s brother went towards the passenger side. Two men approached B.R. and his brother and said, "[G]ive me your money." B.R.'s brother turned around and saw an African American man in an army-type hat near him. The other man near B.R. shot B.R. B.R.'s brother then took off running towards the house. The evidence supports that the man near B.R.'s brother tried to shoot B.R.'s brother but the weapon misfired. B.R.'s brother was not able to provide a full description of the two men but noted one of them was wearing a "Boonie cap" or army style hat. B.R. was shot multiple times and died from his injuries.

{¶10} B.R.'s brother told police that the men fled on foot towards Tallmadge Avenue. Near the scene, police encountered two men, one wearing a cap similar to the one that B.R.'s brother described. Once the male in the cap observed police, he and the other man took off running. The two men and an Asian male, who was found with the two men when they were detained, were taken into police custody. Drugs or drug paraphernalia were found on the two men who fled police and all three had outstanding warrants. The Asian man, identified as B., had been observed earlier

at the crime scene near B.R.'s body, possibly providing assistance. When he was stopped with the two other men, he had blood on him. The individual in the cap, who was identified as J.B., was taken to the location where B.R.'s brother was and B.R.'s brother indicated that the hat looked like the one worn by one of the shooters. J.B. denied being near the crime but admitted that he used to use crack cocaine with B.R.'s brother. The other man was discovered to be A.D. The three men were in custody at the time of the subsequent crimes and, thus, could not have been involved in them.

{¶11} One live round and three spent shell casings were found at the crime scene. Officer testimony indicated that the live round was likely present due to misfire or manual ejectment to clear a jam of the firearm. Examination of the live round by a firearms expert revealed multiple light firing pin strikes, which could be caused by several things, including a malfunction of the weapon. Due to an error, only two casings were sent for further analysis. The two casings were determined to be Remington 380 auto fired cartridge cases and the live round was found to be a 9x18 mm Makarov cartridge. The two casings were fired from the same weapon. The bullet recovered from B.R. was determined to be a fired 380 auto jacketed hollow point bullet. Assuming the two casings and the recovered bullet were fired from the same weapon, the firearms expert indicated that the only weapon that he knew would fire all three was a Hi-Point.

{¶12} Gunshot residue testing was performed on J.B. and A.D. at approximately 6:00 a.m. that morning. Both tested negative. Additionally, DNA testing was conducted on certain items related to the crime scene, including a tank top located near the crime scene. A blood stain on the shirt was tested for DNA and a mixture of profiles was found; however, the blood was not that of B.R., J.B. or A.D. The DNA that was interpretable was consistent with an unknown male. The back interior near the label of the shirt was also tested and a mixture of DNA profiles was found.

Two major profiles were discovered, one consistent with J.B. and one consistent with the same unknown male profile present in the blood stain. There was additional data present, but it was insufficient for comparison. A.D. and B.R. were excluded as possible contributors to the DNA found on the interior of the shirt. The profiles were also entered into the CODIS DNA database for comparison, but no matches were found. That database includes profiles from other forensic samples, profiles from convicted offenders, and certain arrestees.

{¶13} An autopsy was performed on B.R. B.R. had four gunshot wounds, one to the back of the head, one to the face, one to the neck, and one to the left upper arm. The gunshot wound to the back of the head was fatal.

### South Arlington Parking Lot

{¶14} Around 6 a.m. on July 7, 2018, Akron police received a 911 call reporting that an African American man had been found dead in a parking lot near 5th Avenue and South Arlington. He had been shot in the head. The victim was later identified as R.M. The individual who called 911 told police that she had seen R.M. alive earlier that morning. She did not know why R.M. was shot and did not see the shooting. She told police that R.M. was a drug user and that he squatted in abandoned houses. She speculated that perhaps he owed someone money. Other information police discovered supported that R.M. was homeless and had a drug problem. In addition, police learned that R.M. was a small-time thief and had spent time in prison. No shell casings were found at the crime scene. It was estimated that the crime took place between 4:30 and 5:30 a.m.

{¶15} An autopsy was also performed on R.M. R.M. had one gunshot wound to the head. The bullet entered near his right eye, perforated his paranasal sinuses, and lodged in the left temporal bone of the skull, but, due to the path of the bullet, it did not directly penetrate the brain. Instead, his brain was injured due to the concussive forces generated by the gunshot. Due to the

stippling on R.M.'s face, the medical examiner indicated that the muzzle of the gun was held within inches of his face. Cocaine metabolites were found in R.M.'s toxicology screen.

{¶16} The bullet recovered from R.M. was sent for further analysis. It was determined to be a 380 auto jacketed hollow point bullet. When the bullet was compared to the bullet recovered from B.R. it was discovered that the bullets were fired from two different weapons.

## 6th Avenue and Minordy Place

{¶17} C.H. was a long-time drug addict who supported her habit through prostitution. Sometime between 3:00 and 5:00 a.m. on July 7, 2018, she was in the area of 6th Avenue and Minordy Place. She first saw an African American male. He told her to come here and called her "Auntie." The man held up a baggie that she thought had drugs in it and told her that he had something for her to try. She went over to where he was and he grabbed a hold of her arm and pulled her into the alley. C.H. then saw another African American man and a Caucasian blond woman. They appeared to be embracing. When C.H. turned around she saw the woman pull a gun out of her waistband and the woman pointed it at C.H. She did not get a good look at the men but got a good look at the woman. C.H. thought the woman appeared to be participating of her own free will and told police at one point the woman was smiling. One of the men took the gun from the woman and said, "I have to do this one." One of the men then held a gun against her head. C.H. said, "Please don't do this. I have kids." One of the men said, "So what, B*tch. I have kids, too." He then said, "Are you ready to die?" He tried to shoot her a couple of times, but the bullets fell to the ground. He reloaded the gun and tried to shoot her again and the bullets fell out again. As he was trying to pick up the bullets, C.H. took off running, however, one of the men tripped her. Then, the woman jumped on her. C.H. used her foot to wedge the woman off of C.H. and she ran.

{¶18} While police were at the South Arlington scene, they received information that there was another possible victim in the area, C.H. C.H. took officers to the alleyway near 6th Avenue and Minordy Place where she was attacked. Two live rounds were found in the alleyway. Officer testimony indicated that finding live rounds at a crime scene could indicate that the weapon malfunctioned. This area was approximately one hundred yards from where R.M.'s body was discovered. The live rounds were sent for DNA testing, but insufficient DNA was recovered for comparison purposes. A firearms expert also examined the rounds and determined that they were 380 auto cartridges with one demonstrating a light firing pin strike. The firearms expert indicated that a light firing pin strike could be caused by several things, including a malfunction of the firearm. A cigarette butt was also found at the scene. The DNA profile recovered from the cigarette butt was consistent with the profile of C.H.

### The Investigation and Trial

{¶19} Lieutenant Scott Lietke, with the Akron Police Department, was a sergeant in the major crimes unit at the time of the investigation and was the lead investigator. After police interviewed the three men detained near the B.R. crime scene and interviewed B.R.'s brother, Lieutenant Lietke was less confident in the men's involvement. Police remained without further leads until B.H. came to their attention.

{¶20} On August 9, 2018, B.H. was stopped by a state trooper and a gun and drugs were found in the car. B.H. agreed to meet with the drug task force to fill out paperwork to be a confidential informant. The questionnaire included questions about whether the person completing the form had information on unsolved murders, rapes, or assaults. B.H. circled yes and showed the police a newspaper article about the murders. Shortly after signing the confidential informant agreement, B.H. was stopped again by police and more drugs were found on her. As

the agreement only covered actions prior to signing the agreement, B.H. ultimately was charged and sentenced to prison related to the drugs found after the agreement was signed. B.H. then talked to Akron homicide detectives. She gave police Donyea and Orlando Tyus' names, whom she knew as Bishop and Orka, as well as James' name and discussed what B.H. had heard about the crimes.

{¶21} The record disclosed that B.H. knew both Donyea and Orlando Tyus through her connection to drugs. B.H. both used and sold drugs. B.H. also knew James, who was a fellow addict. B.H. indicated that James paid for her habit through prostitution. B.H. had both James' and Donyea Tyus' contact information in her cell phone. B.H. had three numbers that she knew were associated with Donyea Tyus, one ended in 1395, one ended in 4809, and the last ended in 5550. She indicated that she always spoke to Donyea Tyus and not Orlando Tyus. She also had a number for James. While that number was listed in her phone as belonging to someone else, B.H. knew James to use it. That number ended in 9685.

{¶22} At some point after July 7, 2018, James became afraid of Donyea and Orlando Tyus. B.H. let James stay at B.H.'s house to try to keep her safe. James and B.H. had multiple conversations where James implicated herself, and Donyea and Orlando Tyus in the murders. B.H. also heard about the murders from a couple other drug addicts that she knew. She indicated that James told those people about the murders as well. B.H. stated that James told her the crimes were part of a gang initiation and that each person had to kill someone to be a part of the gang. B.H. believed that the killings were random.

{¶23} In early August 2018, James was arrested on unrelated drug charges. In the next couple days, B.H. had a conversation with both Donyea and Orlando Tyus at B.H.'s house. The three were sitting on the couch, with Donyea Tyus on one end, Orlando Tyus on the other, and

B.H. in the middle. B.H. felt intimidated. B.H. testified that every time Donyea and Orlando Tyus came to her house they had guns with them. Donyea and Orlando Tyus were aware that James was in jail. During the conversation, B.H. was asked if James was going to keep quiet about what Donyea and Orlando Tyus had done. Based on the conversation with them and the other information B.H. had at the time, B.H. believed that Donyea and Orlando Tyus had murdered people. However, they did not use those words during the discussion. Donyea Tyus was the one that did the talking and Orlando Tyus would just nod and say yes. Initially, B.H. believed that James was being held by Donyea and Orlando Tyus against her will during the crime spree. Later, B.H. came to understand that James was a willing participant.

{¶24} Following B.H.'s interview with police, on August 13, 2018, James was transported from jail to speak with police about the events of July 7, 2018. James told police that she did not recognize photos of the victims but admitted to knowing Donyea and Orlando Tyus, whom she knew as Bishop and Orka. James expressed concern for her safety. While she said initially that she was not afraid of Donyea and Orlando Tyus, she did say that they were intimidating. James then proceeded to tell police about the crimes.

{¶25} The following day, police presented C.H. with three photo arrays. One included James, one included Donyea Tyus, and one included Orlando Tyus. C.H. identified James in the photo array and indicated she was 80 to 90 percent certain that James was involved. At trial, C.H. indicated that she did not get as good of a look at the men and did not feel confident in identifying them. C.H. did not pick out either Donyea or Orlando Tyus' photos and instead selected photos of other people as being possibly or likely involved. That same day, Orlando Tyus was arrested. Three phones were found on his person. The number associated with one of the phones ended in 4809, the same number B.H. had associated with Donyea Tyus.

{¶26} On September 7, 2018, Donyea Tyus was arrested during a traffic stop. Three people were in the vehicle including Donyea Tyus' girlfriend. Donyea Tyus gave police a false name during the stop. However, his true identify was soon discovered. A cell phone was recovered near Donyea Tyus' girlfriend. That phone appeared to be used by both Donyea Tyus and his girlfriend based upon information extracted from the phone. Photos of Donyea Tyus were also found on the phone. The phone number associated with that phone ended in 1812. The contacts included "Cheyenne[,]" which listed the phone number associated with James. The 1812 number also had communications with the 1395 phone number previously noted above to be associated with Donyea Tyus. In at least one of those communications, it appears Donyea Tyus' girlfriend may have been using the 1812 phone to communicate with Donyea Tyus via the 1395 number. A phone with the 1395 number was never recovered.

{¶27} When Donyea Tyus was interviewed by police, he denied any knowledge of the murders and said he was with his girlfriend all weekend on Susan Court on the west side of Akron.

{¶28} James also testified at trial. At the time of the events, she was 20 years old and had known Orlando Tyus for a few years and Donyea Tyus for a few months. James was using both methamphetamine and fentanyl at the time and had been addicted to heroin since she was 14 years old. On July 7, 2018, Orlando and Donyea Tyus came over to the house James was staying at, which was located at Hammel and Crosier Streets in Akron. Both men were wearing hats. Donyea Tyus was wearing a "drill sergeant hat" and Orlando Tyus had on a fisherman's hat. James used some fentanyl before leaving. They all left in a silver car. Orlando Tyus drove, Donyea Tyus was in the front passenger seat, and James was in the back. Both Donyea and Orlando Tyus had handguns with them and they all had phones with them.

{¶29}  They went to North Akron and pulled up behind a car and waited for five to ten minutes.  They then saw two Asian men were walking towards the parked car in front of them.  Orlando and Donyea Tyus got out and told James to stay in the car.  Orlando Tyus approached the driver's side and Donyea Tyus approached the passenger.  James heard Donyea Tyus tell the passenger to give Donyea Tyus money.  Orlando Tyus fired three or four shots at the driver.  Donyea Tyus pointed his gun at the passenger but it did not go off.  They came back to the car.  Donyea Tyus asked for Orlando Tyus' gun so he "[could] go try to finish him[,]" but Orlando Tyus refused and indicated that they had to leave.  They drove towards the east side of Akron to 5th and Arlington.  They all got out of the car and started walking towards Arlington.  Orlando and Donyea Tyus were talking about "body for body[.]"  Donyea Tyus was saying how he was mad because he did not get his body. Donyea Tyus indicated that he "was going to get [the next person they saw.]"  They saw a man walking towards some apartments.  Donyea Tyus went over, shook the man's hand, put the gun up to the man's head and pulled the trigger.  Donyea Tyus ran back to them and said that he knew the man he shot from prison.  Orlando and Donyea Tyus told James that, because she just saw them kill two people, she had to kill someone or they would kill her.  They told her that they were initiating her into their gang.

{¶30}  The three crossed Arlington and walked to a side street.  Donyea and Orlando Tyus saw a woman and they tried to lure her over indicating that they had what she needed.  They told her to come over and called her "auntie."  Orlando Tyus had baggies of drugs out.  The woman came over.  While her back was to Donyea Tyus and James, Donyea Tyus handed James the gun.  James put the gun to the woman's head and pulled the trigger but the gun did not go off.  The woman turned around and begged for her life.  She said, "[P]lease don't.  I have kids."  James handed the gun back to Donyea Tyus.  Donyea Tyus said, "B*tch I have kids, too."  Then he tried

to shoot the woman but the gun still did not fire. The woman tried to run but Orlando Tyus tripped her. They told James to go get her so James grabbed the woman but the woman kicked James and got away. As the three were fleeing, Orlando Tyus realized he dropped a baggie and so told James to go get it. She went back and used her flashlight on her phone to find it. She picked it up and started walking back and walked past them. They followed her and told her not to try to leave. Donyea Tyus then pushed her. She grabbed the baggie out of her bra and told them that she was not trying to leave. They did not go back to the car and headed back to James' house. Donyea Tyus stayed the night but Orlando Tyus got an Uber and left. After Donyea Tyus left, she left the house because Donyea Tyus said he would be coming back. She was afraid for her safety and went to stay with B.H. She told B.H. what happened. Orlando and Donyea Tyus started harassing B.H. so James left B.H.'s house.

{¶31} James was ultimately transferred to Geauga county jail after her interview with police and charged with felonious assault. She testified at the grand jury at a time when there was no written agreement in place; however, she only testified about the first two shootings. She was warned at the grand jury proceedings that she could be incriminating herself. In February 2019, James entered into an agreement concerning the felonious assault charge. She was required to testify truthfully and, if she did so, she would not be charged with crimes related to B.R. and R.M. She also pleaded guilty with respect to the drug charges and her sentencing was postponed until after she testified at Donyea and Orlando Tyus' trial. She admitted that she originally told police during her interview that she was trying to shoot past C.H. and that was a lie. James identified both Donyea and Orlando Tyus in court.

{¶32} In addition to James' testimony, and the evidence discussed above, the State presented other evidence, which tended to support James' testimony. For example, surveillance

video of the area near the Schiller Avenue crime scene was offered into evidence. While that video did not record the crime, it captured the intersection of Schiller and Tallmadge Avenue. On the video, approximately ten minutes prior to the 911 call, a vehicle is seen pulling up and parking on Schiller Avenue. Around the time of the 911 call, movement is visible near the car, the brake lights come on, and the car leaves. The car appears to back up and head northbound on Schiller.

{¶33} There was also evidence presented that R.M. did spend time with Donyea Tyus in prison. In fact, the records reflect that they were in three separate facilities together for a total of 713 days. For 41 of those days, their bunks were nearby.

{¶34} Moreover, Jacob Kunkle, a Special Agent with the FBI, who is part of Cellular Analysis Survey Team ("CAST"), testified concerning the activity and location of cell phones associated with Donyea and Orlando Tyus during the crimes. CAST is a group of agents and task force officers who have been trained to analyze cell phone records and determine general whereabouts of phones. Special Agent Kunkle's analysis focused on two numbers: one ending in 4809, the number of the phone found on Orlando Tyus at the time of his arrest, and one ending in 1395, which is a phone number that had been associated with Donyea Tyus. Special Agent Kunkle could not pinpoint the location of the phones at any time; in fact, where the phone was at a given time could have been any point within several miles. In addition, he could not tell from his analysis who was using the phone. Nonetheless, from his analysis, Special Agent Kunkle determined that between 3:00 a.m. and 3:30 a.m. on July 7, 2018, those numbers utilized cell sites in the general area of south Akron. This area includes the location of James' house. Between 3:30 and 4:00 am those numbers utilized cell sites indicating that the phones were moved to the general area of the B.R. homicide. Between 4:00 a.m. and 7:00 a.m., the 4809 number utilized cell sites indicating it

was in the general area of the R.M. homicide and C.H. assault. Thus, between 3:00 a.m. and 7:00 a.m. both numbers used cell sites that were in and around Akron.

### Discussion

{¶35} It is undeniable that James' testimony was vital to the State's case. It is also true that James received a plea deal in exchange for her truthful testimony. However, the jury was made aware of that and was even instructed as to the credibility issues posed by the testimony of accomplices. Nonetheless, James' testimony cannot be viewed in a vacuum. Numerous parts of her testimony were corroborated by other testimony or evidence. While some of that testimony came from other individuals with criminal records, the jury was in the best position to determine all of the witnesses' credibility. *See Moore*, 2020-Ohio-3708, at ¶ 30. Notably, when James relayed the events of July 7, 2018, she used some of the same phrases that the victims used in recounting the events. James also indicated that Donyea Tyus knew R.M. from prison and the record demonstrates that Donyea Tyus and R.M. spent a fair amount of time in the same prison and some of that time in nearby quarters. Moreover, the timing of the events at the Schiller crime scene as discussed by James at trial is supported by the surveillance video recorded near the crime scene. James also was correct at approximating the number of shots fired at the Schiller crime scene and in knowing that that shooting involved two shooters and two weapons.

{¶36} Overall, when the record and testimony is reviewed in its entirety, we cannot say that the jury was unreasonable in failing to discount James' testimony. While James was shown to have lied about certain things and to have not told police all the details she revealed at trial, her overall testimony was consistent with other significant portions of the evidence. Donyea Tyus has not demonstrated on appeal that the jury's verdicts were against the manifest weight of the evidence.

{¶37} Donyea Tyus' first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE GRUESOME PHOTOGRAPHS OF THE VICTIM IN VIOLATION OF APPELLANT'S RIGHT TO A FAIR TRIAL AS PROTECTED BY THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION[.]

{¶38} Donyea Tyus argues in his second assignment of error that the trial court erred in admitting certain gruesome photographs. Specifically, Donyea Tyus challenges the admission of Exhibits 48B and 48C which are autopsy photographs of R.M. He argues that the photos were highly prejudicial, and that their probative value was minimal.

{¶39} Evid.R. 403(A) provides that, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Whereas Evid.R. 403(B) states that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

{¶40} "Autopsy photographs are generally admissible to help the jury appreciate the nature of the crimes, to illustrate the coroner's or other witnesses' testimony by portraying the wounds, to help prove the defendant's intent, and to show the lack of accident or mistake." (Internal quotations omitted.) *State v. Baskerville*, 9th Dist. Summit No. 28148, 2017-Ohio-4050, ¶ 33, quoting *State v. Buck*, 9th Dist. Summit No. 27597, 2017-Ohio-273, ¶ 22. "The term 'gruesome' in the context of photographic evidence should, in most cases, be limited to depictions of actual bodies or body parts." (Internal quotations and citations omitted.) *Baskerville* at ¶ 34. "[T]he mere fact that a photograph is gruesome or horrendous is not sufficient to render it per se inadmissible." (Internal quotations and citations omitted.) *Id.* at ¶ 33. For example, "a trial court

may admit gruesome photographs if they give the jury an appreciation of the nature and circumstances of the crimes." (Internal quotations and citations omitted.) *Id.*

{¶41}  Exhibit 48B depicts the interior of R.M.'s skull with the brain removed. Exhibit 48C depicts the same area except that a portion of the base of the skull bone was removed to locate where the bullet lodged. In addition, Exhibit 48C includes a metal rod to demonstrate the path of the bullet. As discussed above, the bullet that killed R.M. did not directly penetrate his brain and instead entered his body near his right eye, passed through his sinuses, and lodged in the base of his skull. Understandably, how this could occur could have been confusing to the jury. The images presented by the medical examiner, including Exhibits 48B and 48C, would have helped illustrate the medical examiner's testimony and eliminate any confusion as to how R.M.'s fatal injury occurred. Given the foregoing, we cannot say that the trial court abused its discretion in admitting these two photographs. The trial court could have reasonably concluded that the probative value of the photographs was relatively high as compared to the possible prejudicial effect.

{¶42}  Donyea Tyus' second assignment of error is overruled.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRORED BY ADMITTING PHOTOGRAPHS OF APPELLANT HOLDING A FIREARM THAT WERE IRRELEVANT, UNFAIRLY PREJUDICIAL, AND CONFUSED OR MISLED THE JURY IN VIOLATION OF EVID.R. 401, 402, AND 403[.] (Sic.)

{¶43}  Donyea Tyus argues in his third assignment of error that the trial court erred by admitting two photographs, Exhibits 8K and 8L, which depict Donyea Tyus pointing a gun at the viewer/camera. These photos were found on the phone near Donyea Tyus' girlfriend when Donyea Tyus was arrested. Donyea Tyus cites to Evid.R. 403(A) in support of his contention that the photographs should have been excluded.

**{¶44}** "The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Jackson,* 9th Dist. Summit No. 27739, 2017-Ohio-278, ¶ 28, quoting *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 43. "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules [of evidence], or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible." Evid.R. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403. "The touchstone of admissibility is whether the evidence is so remote, speculative, or subject to extraneous circumstances, that, even if otherwise relevant, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury; if so, the evidence will be excluded under the parameters of Evid.R. 403(A)." *Proctor v. Dennis*, 5th Dist. Fairfield No. 05-CA-82, 2006-Ohio-4442, ¶ 29.

**{¶45}** The State presented the testimony of Dylan Matt who is a forensic scientist with the Ohio Bureau of Criminal Investigation. Mr. Matt was qualified as an expert in the field of ballistics. Mr. Matt indicated that if the fired cartridge cases found at the Schiller Avenue crime scene and the bullet removed from B.R.'s skull were fired from the same weapon, then the Hi-Point was the only type of firearm that Mr. Matt knew of that could have fired all three. However,

he noted that other possibilities may exist. He testified that those findings, which were also outlined in a report, were based upon a reasonable degree of scientific certainty.

{¶46} The State then sought to present the jury with photographs of Donyea Tyus pointing a firearm at the viewer/camera. Those photographs, Exhibits 8K and 8L were on a phone found near Donyea Tyus' girlfriend at the time of Donyea Tyus' arrest. Prior to allowing the testimony, the trial court allowed a voir dire of Mr. Matt. The State sought to ask Mr. Matt if the weapon Donyea Tyus was holding in the photographs could have fired any of the live rounds or spent shell casings. Mr. Matt told the trial court that he could not say for certain the make and model of the weapon based on the photographs, but that it appeared to be a Hi-Point firearm. Mr. Matt went on to state that, if it was a Hi-Point firearm, then it was possible that some of the fired cartridge cases could have been fired from the weapon. However, he could not say what caliber the weapon in the photographs was. Mr. Matt told the trial court during the voir dire that, based upon a reasonable degree of scientific certainty, he could not eliminate the weapon in the photographs as a possible weapon involved in the crimes or say that it was consistent with a weapon involved in the crimes. The trial court then allowed Mr. Matt to testify about the photographs over defense counsel objection.

{¶47} Mr. Matt told the jury that Exhibit 8L appeared to show the muzzle end of a firearm that had a general profile of a Hi-Point firearm; he clarified that Hi-Point was a manufacturer of firearms. Mr. Matt indicated that he could not tell much else from the photograph as he could not see the side where the make, model, and caliber would be indicated. Mr. Matt then agreed that assuming the fired shell casings from the Schiller Avenue crime scene and the bullet removed from B.R. were fired from the same gun, the only known weapon that could be responsible would be a Hi-Point. On cross-examination, Mr. Matt acknowledged that his opinion that the weapon in the

photos had the characteristics of a Hi-Point firearm was not based upon a reasonable degree of scientific certainty.

{¶48} We are troubled by the admission of this testimony. No firearms were recovered during the police investigation. Thus, Mr. Matt did not test or examine any firearms with respect to this investigation. Mr. Matt did not definitively conclude that a Hi-Point firearm was used in the crimes; instead, he determined only that *if* the fired cartridge casings from the Schiller Avenue scene were fired from the same weapon as the weapon that fired the bullet that killed B.R., the only weapon that he knew of that could be responsible was a Hi-Point. The report specifically states there could be other possibilities. As to the photographs, Mr. Matt could not say for certain that the weapon in the photographs was a Hi-Point firearm and noted that he could not identify the make or model or caliber because he could not see the side of the weapon. It is clear that the State wanted the jury to believe that the weapon Donyea Tyus was holding in the photographs was the murder weapon. Thus, this evidence was prejudicial to Donyea Tyus.

{¶49} However, even if we were to conclude that the admission of the evidence violated Evid.R. 403, we cannot say that Donyea Tyus was *materially* prejudiced by the admission of the evidence. *See Jackson*, 2017-Ohio-278, at ¶ 28. Given the totality of the evidence presented at trial, as previously set out, we cannot say that Donyea Tyus has demonstrated on appeal that he suffered material prejudice as a result of the admission of the evidence. *See id.* at ¶ 30.

{¶50} Donyea Tyus' third assignment of error is overruled.

### ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED AND PREJUDICED THE JURY IN ITS INSTRUCTION TO THE JURY ON HAVING WEAPONS UNDER DISABILITY[.]

{¶51} Donyea Tyus argues in his fourth assignment of error that the trial court erred in its instruction to the jury on the charge of having weapons while under disability. Specifically, Donyea Tyus asserts that, because he stipulated that he had a prior conviction that satisfied the first element of the offense, the trial court should not have referred to that conviction as a felony offense of violence.

{¶52} "[A] trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *Jackson* at ¶ 23, quoting *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. "Although trial courts enjoy broad discretion in fashioning jury instructions, they must 'present a correct, pertinent statement of the law that is appropriate to the facts.'" *Jackson* at ¶ 23, quoting *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46.

{¶53} As to Donyea Tyus and the count of having weapons while under disability, the trial court told the jury the following:

> In Count 7, the defendant, Donyea Tyus, is charged with having a weapon under disability.
>
> Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about the 7th day of July, in the year 2018, and in Summit County, Ohio, the defendant, Donyea Tyus, did knowingly acquire, have, carry, or use a firearm, and at the time the defendant had previously been convicted of a felony offense of violence.
>
> Knowingly has been defined for you.
>
> "Had" means possessed.
>
> Possession has been defined for you.
>
> Firearm has been defined for you.
>
> As to the prior conviction, the defendant, Donyea Tyus, stipulates – which is a fancy legal word for agrees – stipulates that he was previously convicted of a felony offense of violence that prohibited him from acquiring, having, carrying or using a firearm. This shall be accepted by you as a proven fact.

The State must still prove beyond a reasonable doubt that the defendant knowingly acquired, had, carried, or used a firearm at the time of the offense alleged in this indictment.

The evidence that the defendant was previously convicted of a felony offense of violence was received because a prior conviction is an element of the offense charged in Count 7.

It was not received, and you may not consider it to prove the character of the defendant in order to show that he acted in conformity with that character.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of having weapons under disability, your verdict must be guilty, according to your findings.

If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of this count of having weapons under disability, then your verdict must be not guilty, according to your findings.

{¶54} Donyea Tyus was indicted for violating R.C. 2923.13(A)(2). R.C. 2923.13(A)

provides:

Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

(1) The person is a fugitive from justice.

(2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.

(3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

(4) The person is drug dependent, in danger of drug dependence, or a chronic alcoholic.

(5) The person is under adjudication of mental incompetence, has been adjudicated as a mental defective, has been committed to a mental institution, has been found by a court to be a mentally ill person subject to court order, or is an involuntary

patient other than one who is a patient only for purposes of observation. As used in this division, "mentally ill person subject to court order" and "patient" have the same meanings as in section 5122.01 of the Revised Code.

{¶55} Donyea Tyus argues that the trial court could have instead instructed the jury "the defendant stipulates that he's previously been convicted of an offense that prohibited him from acquiring, having, carrying or using a firearm[.]" However, such an instruction would be too broad; eliminating all language stating the offense was a felony offense of violence would leave insufficient information to establish a violation of R.C. 2923.13(A)(2), which was the charge before the jury. Thus, the fact that the prior conviction was an offense of violence was an essential element of the offense. *See State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, ¶ 35; *id.* at ¶ 33. Instructing the jury that the prior conviction was an offense of violence was not an abuse of discretion under the circumstances.

{¶56} Therefore, Donyea Tyus has not demonstrated that the trial court abused its discretion in instructing the jury.

{¶57} Donyea Tyus' fourth assignment of error is overruled.

III.

{¶58} Donyea Tyus' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

CALLAHAN, P. J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

ANGELA M. KILLE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.