[Cite as *State v. Heath*, 2026-Ohio-1163.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                          Court of Appeals No.  WD-25-035

      Appellee                                   Trial Court No.  24 CR 382

v.

Andrew Heath                                       **DECISION AND JUDGMENT**

      Appellant                                  Decided: March 31, 2026

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
Kristofer Kristofferson, Assistant Prosecuting Attorney, for appellee.

Autumn Adams, for appellant.

* * * * *

**OSOWIK, PJ.**

{¶ 1} This is an appeal from the judgment by the Wood County Court of Common

Pleas, which sentenced appellant, Andrew Preston Heath,[1] to an indefinite prison term of

four to six years for the offense of felonious assault, after the trial court accepted

---

[1] Appellant is also called "Anthony Preston Heath" in his appellate brief.

appellant's guilty plea and convicted him of that felony offense. For the reasons set forth below, this court affirms the trial court's judgment.

## I. Background

{¶ 2} The following facts are relevant to this appeal. On October 3, 2024, a Wood County Grand Jury issued indictments against the 35-year-old appellant for felonious assault, a violation of R.C. 2903.11(A)(1), and a second-degree felony under R.C. 2903.11(D)(1)(a), and for bribery, a violation of R.C. 2921.02(C), and a third-degree felony under R.C. 2921.02(E). Appellee, the state of Ohio, alleged that on or about late August 13/early August 14, 2024, appellant was at the Three Cheers Tavern in Walbridge, Wood County, Ohio, playing pool for money when he engaged in fighting with bar patrons and sucker-punched the victim, breaking the victim's jaw. The incident was captured on the bar's surveillance video. Then, between September 11 and September 24, appellant offered money with the purpose to corrupt witnesses' testimony before they were subpoenaed or sworn to testify regarding the bar fight.

{¶ 3} After initially pleading not guilty to the charges, discovery ensued, and appellant changed his plea on April 10, 2025. Appellant pled guilty to felonious assault, a violation of R.C. 2903.11(A)(1), and a second-degree felony under R.C. 2903.11(D)(1)(a) with appellee dismissing the bribery charge.

{¶ 4} Appellant signed a written "Plea of Guilty to Indictment and Waiver of Trial By Jury" on April 10, in which he agreed that appellee would dismiss the bribery charge at sentencing and "agrees to stipulate the facts in this case are sufficient to prove the

2.

Defendant committed the [felonious assault] offense beyond a reasonable doubt and support a plea of guilty." Appellant further agreed in writing: "I knowingly, intelligently and voluntarily withdraw my former plea of not guilty and enter a plea of guilty to the following offense(s): Count One: Felonious Assault in violation of ORC Sections 2903.11(A)(1) & 2903.11(D)(1)(a), Felony of the Second Degree." Specifically with respect to sentencing, appellant agreed in writing that the "highest potential 'minimum term' for this [felonious assault] offense is 8 Years. . . . The highest potential 'maximum term' for this offense is 12 Years." Appellant further agreed in writing, "I understand that any recommendations are not binding on the Court and that no promises or guarantees as to sentence have been made to me."

{¶ 5} Appellant acknowledges that in response to the trial court's question, "is there any recommendation as far as sentencing beyond the no contact?" appellee replied, "No, Judge, the State would just ask to address the Court at the time of sentencing. The victim was notified and is present in court today." The trial court engaged in an extensive plea colloquy before accepting appellant's guilty plea and convicting him of felonious assault. The trial court specifically asked appellant, among other matters, if he understood the plea agreement and understood the potential sentence he faced:

> Court: Mr. Heath, did you hear the plea agreement?
> A: Yes, Your Honor.
> Court: Is that your understanding of the agreement?
> A: Yes, Your Honor.
> . . .
> Court: Has anybody threatened you or promised you anything special to get you to enter the plea?

3.

A: No, Your Honor.

Court: I'm going to hold up the plea agreement. Does that look familiar to you?

A: Yes, Your Honor.

Court: Did you have a chance to review that?

A: Yes, Your Honor.

Court: Did you have a chance to read it?

A: Yes, Your Honor.

Court: Did you have a chance to ask your attorney any questions that you might have had?

A: Yes, Your Honor.

Court: Do you feel like you understand what the document says?

A: Yes, Your Honor.

Court: Do you understand the Court doesn't have to follow this agreement and could go straight to sentencing today?

A: Yes, Your Honor.

. . .

Court: Are you prepared to make a complete admission to those allegations, understanding that Count 1, felonious assault, is a felony of the second degree, comes with a possible maximum fine of up to $15,000, comes with a definite minimum term of two to eight years and a maximum indefinite term of up to 12 years?

A: Yes, Your Honor.

. . .

Court: Do you understand that you're pleading to an offense that carries an indefinite sentence?

A: Yes, Your Honor.

Court: Do you understand, this means that you will receive both a minimum and a maximum term sentence?

A: Yes, Your Honor.

Court: Do you understand that at the time of sentencing the Court will select a minimum term for the range of penalties associated with your crime for an F2, that's two to eight years?

A: Yes, Your Honor.

Court: And after the Court picks a minimum sentence, the maximum sentence will automatically be 50 percent of the minimum term. Do you understand that?

A: Yes, Your Honor.

Court: Do you understand that the maximum penalty for an F2 is 12 years?

A: Yes, Your Honor.

. . .

Court: All right. Mr. Heath, are you stipulating to the facts as alleged in Count 1?

A: Yes, Your Honor.

Court: Are you entering a plea of guilty to Count 1, felonious assault, a felony of the second degree?

A: Yes, Your Honor.

Court: The Court will accept your guilty plea to Count 1, find that you entered the plea knowingly, voluntarily and intelligently. . . . The Court will order a presentence investigation, will set it out for sentencing. I think, lastly, I'll just make sure; I know it's in the plea paperwork itself, but, Mr. Heath, do you understand that there is a presumption of prison associated with this?

A: Yes, Your Honor.

{¶ 6} The trial court held the sentencing hearing on May 29, 2025, at which the trial court heard statements from counsel for each party, appellant, and the victim. The trial court, again, reviewed the possible sentence range for appellant's guilty plea to felonious assault:

Court: Good morning. We are scheduled for a sentencing hearing today. We were last in court on April 10th. At that point in time Mr. Heath pled guilty to felonious assault, Count 1, which is a felony of the second degree. That comes with a possible two to eight years as a minimum definite term, up to 12 years as a maximum, indefinite term. It also comes with a possible fine of up to $15,000, and comes with up to three years of post-release control with a minimum amount of time of 18 months that's required. I believe, subject to the plea agreement, the State of Ohio is going to move to dismiss Count 2. Is that accurate?

Appellee: Yes, Judge.

Court: All right, we'll dismiss Count 2. And, based on the plea, the Court ordered a presentence investigation. I've had a chance to review that. . . . [I]s the named victim present in court today?

Appellee: Yes . . . he submitted a letter to the Court which will be read by [the victim advocate].

**{¶ 7}** The trial court proceeded to request statements from the parties. First, appellee stated the following:

> [T]he State is asking for a four-year prison sentence in this matter. The victim sustained a broken jaw as a result of this incident. The attack was unprovoked, the victim was, essentially, sitting at the bar and was sucker-punched. He didn't even turn his head or make any movement prior to being struck, or sucker-punched, by the Defendant. The victim sustained a fractured jaw, which was evidenced by medical records. Additionally, he does suffer both mental and physical effects to this day. The Defendant has previously been given an opportunity to comply with terms of probation in this court, which he failed to do, in a prior case in which he was under supervision here. During the pendency of this trial the Defendant did fail to appear, and that was due to an offense in Mahoning County which was charged as a grand theft of a motor vehicle, with a date of offense of January 9th, 2025. And the State would, additionally, be requesting no contact with the victim, [R.P.], in this matter. And [the victim advocate] of our office would read the victim's statement. . . . [I]n reviewing the PSI there was a mention of a racial slur which had been said at the bar. Throughout the investigation of the case that had not been corroborated or ever mentioned by police or any witnesses, Judge.

**{¶ 8}** Second, the victim gave the following statement read aloud by the victim advocate:

> The Defendant, in my opinion, is a vicious aggressor. The attack imposed upon me by Andrew Heath was totally unprovoked. I did absolutely nothing to the Defendant to warrant my brutal attack. The attack has left me with severe physical and emotional scars. It is my belief that Andrew Heath has no remorse for his actions. It is said that the best predictor of future behavior is past behavior. Therefore, I believe with Andrew's violent history, his potential to cause physical and psychological harm and damage is high. I'm asking the Court to impose the maximum time of imprisonment and financial burden.

**{¶ 9}** Third, appellant's attorney gave the following statement in mitigation:

> Your Honor, this incident all started when my client, he was in Sandusky, Ohio, came home to Walbridge to find his father dead on the

6.

bathroom floor . . . of a heart attack. That's how this all started with my client. His family was all consoling each other and they convinced everybody to go to the bar right there in Walbridge. . . . My client, he doesn't remember every single detail; however, this was not an unprovoked incident. He played pool with the victim, the victim owed him money. These things aren't in the video and . . . I don't know, in their investigation, why [the police] didn't go into those things, but, ultimately, my client was called the N word multiple times, Your Honor. [Appellant has] been in services with Ohio Guidestone. This is the first time now since he's been 18 years old he's been sober. He is working full time; he has a three-year-old he takes care of. In addition, Your Honor, on ORAS[2] he had a moderate score. Based upon everything here today, we would request the Court give my client a chance, place him on community control. He would be willing to have the Court . . . hold over his head the highest amount of prison time, so he can prove to the Court that he has changed, he's grown up and he's moving forward with his life. Thank you, Your Honor.

{¶ 10} Finally, the appellant gave a lengthy statement in mitigation in which he substantially repeated his attorney's statement. However, he provided a few more details, such as immediately following his father's death he went to a liquor store and bought a bottle of vodka and finished it before everyone went to the bar. Once at the bar, appellant understood there were surveillance cameras showing him entering the bar with others. The camera also showed he bought and consumed in rapid succession "three shots" with his family and friends. "We all took all three shots back to back to back and then it all hit because I was already drinking Tito's and I blacked out. . . . . I was blacked out before [my uncle] got there and, [my uncle] said that [the victim] called me a n****r three or four times." It is unclear if the surveillance camera shows appellant blacked out. "I don't

---

[2] According to the University of Cincinnati Corrections Institute, "Ohio Risk Assessment System" is a tool used by Ohio criminal courts to evaluate adult offenders' recidivism risk. A "moderate" score means a "moderate" recidivism risk.

7.

remember anything. When I seen the video, [my fiancé] is trying to hold me back and my [uncle] turns around in the video and he tries to grab me, and then that's when I went and swung. And then, I woke up in the morning with multiple messages, all my friends telling me that I had hit somebody and broke his jaw and this and that, and that's when I called [my attorney]." Appellant stated his remorse. "I just wanted to apologize to [the victim]. I was in the wrong state of mind. I didn't mean what I did. I just -- I went up there, I lost my dad I just lost my dad. He died in August, I put the SCRAM[3] on in September and I been changed ever since. . . . The only reason this happened, I got out of prison in June sober and then my dad died. I just ask for a second chance so I can – that's all I got."

{¶ 11} The trial court then announced ordering appellant's four-to-six-year sentence. Appellant admits he raised no objection to the trial court for his sentence. The trial court gave its reasons for its decision without once referring to appellee's sentencing recommendation:

> As I said, I have reviewed the presentence investigation. Included within the presentence investigation is your criminal history, and you've been in this court before as well. And I hear you, and you're saying, I want a second chance. You've had quite a number of chances though, both prior to your involvement in this case, prior to your involvement with me as a Judge, but since then as well. In fact, the first time you were before this Court with me as Judge I gave you a second chance . . . with that offense.
> . . .
> And I gave you a chance to talk. I'm aware of the circumstances, and because I was aware of those circumstances, I gave you a second chance on that one. And I think what I told you is, you get one chance, and then I gave

---

[3] " SCRAM" means a "Secure Continuous Remote Alcohol Monitor" wearable device around the ankle that is able to monitor for alcohol consumption. *See* R.C. 4511.19(G)(1); *see also* R.C. 4511.191(A)(1)(b).

8.

you more than one chance, because you violated the terms of your community control. And we're back here on another one. And not only are we back here on another one, it's something that caused physical harm to somebody else, it's an F2. That means there's a presumption for prison.

It, maybe, doesn't directly mirror some of your past interactions with law enforcement, but you, certainly, in your history, have prior charges of assault, so this is more of the same. You even have a prior violent offense conviction from activity that occurred in 2016 with regard to that burglary, and I believe you were given an opportunity there when you were sentenced to community control. And you requested a second chance and you violated the terms of your community control and, even there, prison time was imposed. So this isn't the first time in this court, not the first time in other courts, that you've requested a second chance and were given an opportunity for that second chance.

I have reviewed the purposes and principles of sentencing in 2929.11, I've reviewed the seriousness and recidivism factors in 2929.12, I'm taking all of those into consideration, along with the entirety of the record, the statements made today, and the need for deterrence, incapacitation, rehabilitation and restitution. And, based on that, the Court. finds that a prison sentence is consistent with the principles and purposes of sentencing, find that you're not amenable to community control sanctions based upon the seriousness of your conduct, the impact of your conduct on the victim . . . that it's reasonably necessary to deter you from committing future crimes and to protect the public, and I don't believe incarceration will be an unnecessary burden on government resources. It's ordered on Count 1, felonious assault, felony of the second degree, that you serve a minimum definite term of incarceration of four years, and a maximum indefinite term of six years.

{¶ 12} The trial court then confirmed in its journalized sentencing judgment entry,

"The Prosecuting Attorney and Defense Counsel did *not* jointly recommend a sentence."

(Emphasis sic.)

{¶ 13} Appellant timely appealed setting forth one assignment of error:

"Appellant's plea was not made knowingly, intelligently and voluntarily because the

State promised to not make a sentencing recommendation but then requested a 4-year

9.

prison sentence and Appellant's counsel failed to object to the State's sentencing recommendation, causing Appellant to suffer ineffective assistance of counsel."

## II. Guilty Plea

{¶ 14} Despite appellant's reference to ineffective assistance of counsel in his sole assignment of error, appellant does not argue that claim in his brief. App.R. 12(A)(1)(b).

{¶ 15} Rather, appellant admits that since he failed to object to the trial court's sentence, he waived all but plain error, citing *State v. Noling,* 2002-Ohio-7044, ¶ 62, and Crim.R. 52(B). Appellant acknowledges that plain error is a discretionary doctrine of an obvious error not brought to the trial court's attention which affected appellant's substantial rights and the outcome of the proceeding. Appellant further acknowledges that appellee requested a four-year prison sentence "because the attack was unprovoked, the complaining witness sustained a fractured jaw and he suffered from both mental and physical effects, [and] cited Appellant's prior conduct while on probation." In mitigation, appellant offered "that he was sober for the first time since he was 18 years old because he was working with Ohio Guidestone, he was working full time and was involved in the raising of his toddler child. His ORAS scores was moderate and thus Appellant requested he be placed on community control."

{¶ 16} Appellant argues his plea agreement is a contract, citing *Santobello v. New York*, 404 U.S. 257 (1971). As such, appellant contractually agreed to plead guilty to felonious assault only because appellee made an enforceable promise to him that appellee would make no sentence recommendation to the trial court. "Appellant entered the plea

10.

believing the State would not make a sentencing recommendation." When appellee broke that promise to appellant by recommending he serve four years, his conviction and sentence should be voided, citing *Id.* at 262 and Crim.R. 11. Consequently, appellant argues his guilty plea was not made voluntarily, intelligently, and knowingly and "respectfully requests that his sentence be vacated and remanded for resentencing with the State honoring its statement on the record that they would not recommend a sentence."

{¶ 17} In response, appellee argues there was no trial court error because, citing *State v. Vasquez*, 2024-Ohio-2496, ¶ 25 (6th Dist.), appellant failed to meet his burden for plain error. "It is hard to imagine that in entering a plea, Heath relied on the State's statement during sentencing which promised further discussion with the trial court, especially when the agreement not to make a recommendation is not contained within the plea papers." Simply put, there was no agreement that appellee would never make any kind of sentencing recommendation. Appellee "informed the trial court that it would speak at sentencing, although it did not specifically state what it would request," and appellant "confirmed that the statement regarding sentencing was accurate." Appellee then made a recommendation at sentencing and "outlined the facts of the case (which would be contained in the presentence investigation) and asked the trial court to consider the statement of the victim." Nothing in the plea agreement prohibited appellee from doing that. At no time during the change-of-plea hearing or the sentencing hearing did appellant object or seek to clarify any alleged sentencing-silence promise made by

11.

appellee. Ultimately, "There is no evidence in the record to support the contention that the trial court fashioned its sentence based on the recommendation of the State" because the trial court explained its sentence independently from appellee's sentencing recommendation.

## A. Plain-Error Doctrine

{¶ 18} Both parties agree that because of appellant's failure to object to his sentence, he forfeited the issue, absent plain error. We agree. *State v. Ratcliffe*, 2019-Ohio-308, ¶ 10 (6th Dist.). As further discussed below, we find that appellant does not satisfy his burden under the plain-error doctrine. Crim.R. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

{¶ 19} "Plain error exists when the error is plain or obvious and when the error affects substantial rights. To rise to the level of plain error, it must appear on the face of the record that an error was committed." *Ratcliffe* at ¶ 10. Appellant has the burden of demonstrating the plain error doctrine's three-part test: "(1) an error occurred, (2) the error was obvious, and (3) the error affected the outcome of the trial." *Id.* "We take notice of plain error with the utmost of caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *Id.*

> The rule allowing appellate courts to consider "plain error" protects different interests and requires distinct inquiries. One question a reviewing court must ask is whether the alleged error substantially affected the outcome of the trial. The appellate court must examine the error asserted by the defendant-appellant in light of all of the evidence properly admitted at

trial and determine whether the jury would have convicted the defendant even if the error had not occurred. This inquiry assures that justice is done in individual cases.

*State v. Slagle*, 65 Ohio St.3d 597, 604-05 (1992).

### B. Plain Error Analysis

{¶ 20} For the first and second prongs of the plain-error doctrine, we find neither a trial court error, nor an obvious error. Despite appellant's claim of his understanding of the plea agreement, his understanding is neither reflected in the written plea agreement nor in the transcripts of the change-of-plea hearing and of the sentencing hearing. Nothing in the record supports us finding that appellee promised it would never make a sentencing recommendation to the trial court. Appellant's misreading of the plain language of appellant's oral statement in the record that it would reserve the right to make a statement at the sentencing hearing is simply not a plain error. Even if there language about a sentencing recommendation in the plea agreement, "A trial court is not bound to accept the state's recommended sentence in a plea agreement." *State v. Harder*, 2015-Ohio-795, ¶ 7 (6th Dist.). Moreover, even by appellee making a recommendation at the sentencing hearing, the trial court was not required to accept that recommendation. *See State v. Woodmore*, 2021-Ohio-1677, ¶ 13 (6th Dist.).

{¶ 21} We also find no error for the third prong of the plain-error doctrine because no error affected the outcome of the trial. Nothing in the record supports us finding that appellant's guilty plea to felonious assault was not made knowingly, intelligently and voluntarily. Also, nothing in the record supports us finding that the trial court relied on

13.

appellee's sentencing recommendation rather than the other evidence in the record before making its sentencing decision. The trial court listened to the statements made, including appellant's plea for a "second chance"[4] because of his father's death. The trial court clearly notified appellant that it could impose a definite minimum term of two to eight years and a maximum indefinite term of up to 12 years. Appellee's four-year sentencing recommendation was far less than the maximum sentencing parameters.

{¶ 22} The record shows the trial court took into consideration appellant's troubling criminal history confirming that all of the other prior "second chances" resulted in appellant re-offending, including this current offense. Ultimately, the trial court did not impose the maximum sentence for appellant's felonious assault offense. Even if it had imposed the maximum, appellant's counsel stated at sentencing that, "He would be willing to have the Court . . . hold over his head the highest amount of prison time, so he can prove to the Court that he has changed, he's grown up and he's moving forward with his life."

{¶ 23} We find no plain error to prevent a manifest miscarriage of justice in this matter. There was no plain error when appellant knowingly, intelligently and voluntarily entered a guilty plea to the felonious assault offense, which the trial court accepted, and then sentenced appellant for that offense irrespective of any sentencing recommendation by appellee.

---

[4] Although unstated in the transcript, we infer that by "second chance" appellant sought a community control sanction rather than prison.

14.

**{¶ 24}** Appellant's sole assignment of error is not well-taken.

### III. Conclusion

**{¶ 25}** On consideration whereof, we find that substantial justice has been done in this matter. The judgment of the Wood County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, PJ.

JUDGE

Gene A. Zmuda, J.

JUDGE

Myron C. Duhart, J.
CONCUR.

JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.